EL PUEBLO DE PUERTO RICO, apelado, *v.* ÁNGEL CALDERÓN ORTA, acusado y apelante.

*Número:* CR-79-25    *Resuelto:* 3 de abril de 1981

*Carmen Ana Rodríguez Maldonado* y *Ángel De Jesús Sepúlveda,* abogados del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Lirio Bernard de González, Procuradora General Auxiliar,* abogados de El Pueblo.

Opinión emitida por el Juez Asociado Señor Dávila a la cual se unen el Juez Presidente Señor Trías Monge y los Jueces Asociados Señores Torres Rigual e Irizarry Yunqué.

San Juan, Puerto Rico, a 3 de abril de 1981

El apelante fue convicto por dos casos de asesinato en primer grado, dos infracciones del Art. 8 y dos del Art. 6 de la Ley de Armas. En apelación apunta que su identificación como autor de los delitos que se le imputaran fue poco confiable.

La única prueba que vincula al apelante con la comisión de los delitos es el testimonio de Myrna Luz Fermaint Torres. Fue la única persona, entre varias que presenciaron los hechos, que lo identifica como el autor.

Myrna Luz declaró que trabajaba en el Bar y Restaurante El Escorial en la calle Arzuaga de Río Piedras. Se desempeñaba como mesera, aunque en ocasiones trabajaba atendiendo la barra tras el mostrador. Para la fecha de los hechos, hacía como dos meses que trabajaba en el lugar. En esa ocasión atendía la barra. En el lugar había aproximadamente diez personas, inclusive los empleados. Entre las personas allí presentes estaban Darío Rosario y Manuel Enrique Almonte Abreu, conocido por Nan. A las 11:20 de la noche irrumpieron en el local dos individuos. Uno (la testigo se refiere a él como "el de más alante") se adentró por entre las mesas, dio una vuelta y sacó una pistola. Ordenaron que todos se tiraran al piso. Se llevaron dinero. Dos personas resultaron muertas: Darío Rosario y Nan Almonte.

Los asaltantes huyeron. De inmediato comenzó la investigación. La policía interrogó a los testigos, tomó fotografías y ocupó una gorra amarilla en la escena.

Sobre la identidad de los asaltantes, Myrna Luz declaró lo siguiente:

HON. JUEZ:

P—Quién tenía gorra amarilla.

R—El acusado aquí presente.

HON. FISCAL:

P—Recuerda quién fue el primer agente que fue a investigar el caso con usted?

R—No recuerdo.

P—Recuerda si usted le dio alguna descripción de la persona que usted podía identificar?

R—En este momento no recuerdo.

P—Le mencionó algo sobre la gorra amarilla?

R—No me acuerdo.

.    .    .    .    .    .    .    .

HON. JUEZ:

P—Dónde se encontraba la gorra?

R—Tirada en el piso a la entrada de la puerta.

P—La puerta principal por donde se entra?

R—Sí, señor.

HON. FISCAL:

P—O sea, la gorra la encontró usted?

R—Sí, estaba allí tirada.

En el contrainterrogatorio surgió también que en la declaración jurada que Myrna Luz prestó ante el fiscal investigador, ella no hizo descripción alguna de los asaltantes; ni siquiera declaró que alguno de ellos tuviera gorra puesta.

HON. JUEZ:

P—Le pregunto si en la declaración jurada que prestó al Fiscal, esa que tiene en las manos, identificación 2 de la defensa, si ahí hace mención, referencia, que a la persona que usted estuvo observando como cinco a seis minutos que ha dicho aquí que es el acusado, tenía una gorra puesta?

R—Aquí no aparece.

LCDO. SEPÚLVEDA:

P—No aparece entonces. Ahora, le describió al Fiscal la persona que usted vio?

R—Sí, señor.

P—Tendría la bondad de decir cómo describió esa persona en la declaración jurada?

R—Aquí?

P—Sí?

R—Aquí no . . .

HON. JUEZ:

P—Hay descripción de esa persona?

R—No hay.

LCDO. SEPÚLVEDA:

P—Vuelvo y le pregunto, a la policía, usted la describió?

R—No.

P—No le dió descripción ninguna?

R—No.(¹)

En cuanto al tiempo de observación, Myrna Luz declaró lo siguiente:

LCDO. SEPÚLVEDA:

P—Mire a ver si usted puede decirnos a base de tiempo ahora, desde que ellos entran que usted los ve, que entran esas dos personas hasta que alguien grita, "tírense al piso," que tiempo pasa?

R—No puedo calcular la hora.

P—Pero sí fue rápido, cosa de minutos, segundos?

R—No me acuerdo.

P—No puede calcular el tiempo?

---

(¹) Anteriormente, la testigo había declarado lo siguiente:
"LCDO. SEPÚLVEDA:

P—¿Cómo eran las características físicas de él?

R—Tenía bigote, tenía una barba recién crecida.

P—Continúe.

R—Era trigueño.

P—¿Qué más?

R—Y delgado.

P—¿Y estatura más o menos?

R—Era bajito, bajo.

P—¿Y eso lo describió a la policía?

R—Sí, señor.

P—¿Cuándo lo describió a la policía, en qué momento?

R—No me acuerdo."

Nótese, sin embargo, que de estas afirmaciones es que se retracta.

En cuanto a la descripción que aquí hace, baste decir que se trata de una descripción con el acusado presente en el tribunal, luego de haber visto una fotografía suya y de haberlo observado en una rueda de confrontación. La identificación en el juicio, por sí sola, no satisface el debido procedimiento de ley, cuando, como en este caso, la identificación extrajudicial no ha sido confiable.

R—No.

P—Pero puede calcular que estuvo de cinco a seis minutos viéndolos?

R—Sí, señor.

Un experimento llevado a cabo para comprobar la capacidad de la testigo para calcular el tiempo transcurrido, demostró que el tiempo que ella estimó como seis minutos fue cronometrado por el propio tribunal de instancia solamente como tres, o sea, la mitad de lo que ella estimaba.

La testigo se ubica a sí misma en la barra; unas veces detrás de una columna y otras al lado. Declaró que estuvo mirando al de la gorra a una distancia de ocho pies.

Sobre la iluminación del lugar, Myrna Luz declaró que:

R—Lo que da claridad en el negocio es largo. Es estilo como las de aquí, pero largas.

Hon. Juez:

P—Son fluorescentes, como un tubo?

R—Sí señor.

Lcdo. Sepúlveda:

P—Cuántas de esas hay?

R—No me acuerdo.

P—Habrá más de una?

R—Sí, tiene que haber más de una.

P—De esas sí se acuerda, pero no recuerda si hay luces rojas?

R—No.

Al concluir el incidente todos se levantaron. Myrna Luz afirma que todos los clientes salieron corriendo hacia afuera, incluso los dos asaltantes. A éstos los vio de espaldas.

En este testimonio fue que el jurado apoyó su veredicto de culpabilidad en los casos de asesinato y Ley de Armas.

La prueba de defensa consistió en el testimonio del agente investigador Luis F. Padilla y en los de tres testigos oculares.

Luis F. Padilla, el agente, declaró a los efectos de sus gestiones investigativas. Interrogó a cinco o seis testigos, pero sólo Myrna Luz había visto el incidente en forma tal que

podía identificar a alguien. En varias ocasiones le llevó grupos de fotografías, pero Myrna Luz no pudo identificar a nadie.

Posteriormente la Policía recibió una llamada anónima que involucraba a un individuo conocido por El Manchao con el asalto y asesinatos en El Escorial. Como consecuencia de dicha confidencia, Padilla gestionó y obtuvo una fotografía del apelante, que fue la que Myrna Luz señaló como la fotografía del de la gorra. El agente Padilla no vio el lugar de los hechos por dentro.

Los demás testigos de descargo, todos testigos presenciales de los hechos, declararon más o menos en los siguientes términos, según se resume en el alegato del Procurador General.

María Olmo Hernández declaró que trabajaba en el Bar Restaurant El Escorial para la fecha de los hechos. Que el día 27 de julio de 1978 entraron dos personas, uno era de color oscuro y el otro, claro. Que éstos dijeron "esto es un asalto" en forma bien rápida. Uno entró, el otro se quedó en la puerta. Señaló que no pudo identificar a nadie, a pesar de que le mostraron fotografías, e indicó que todo pasó rápido y estaba oscuro.

Declaró que uno de los asaltantes tenía una gorra "como de playa", demostrándole al jurado la forma en que la llevaba puesta. Indicó que el otro tenía melena, tenía un gorro, pero no pudo decir cómo lo tenía. Declaró que había más o menos trece personas en el negocio, inclusive los empleados que eran cuatro. Que había una mesa con cuatro personas, y dos empleados al lado de una nevera. A preguntas del fiscal, indicó que desde la silla de los testigos hasta donde se encontraba el jurado, donde se paró el fiscal, se podía ver claramente.

José Moya Hernández indicó que conoce el negocio El Escorial, ya que había estado anteriormente en él. Que la noche de los hechos se encontraba dentro del negocio jugando en una máquina de *pinball* junto a otras dos personas. Que entraron dos personas y una dijo: "Tírense al piso, esto es

un asalto". Que se tiró al piso y, luego, oyó disparos. Que no pudo reconocer a nadie. Describió la luz del lugar como turbia. Indicó no sabe qué tipo de lámparas hay allí. Señaló que ayudó a socorrer a los heridos. Que no le vio la cara a ninguno de los que llegaron al negocio, ya que no pudo verlos. No pudo determinar de dónde surgieron los disparos. Indicó que fue entrevistado por la Policía, pero no fue llevado al Cuartel. Señaló que todo ocurrió en forma rápida.

Indicó que al ocurrir el suceso, él estaba jugando en una máquina que queda en el centro más o menos, entrando al negocio, a una distancia de quince a dieciséis pies de la puerta de entrada, a mano derecha. Señaló que había alrededor de diez a doce personas en el negocio y que él estaba como a dieciséis pies de distancia de la barra. A preguntas del fiscal, declaró que el lugar no estaba claro ni oscuro, en general "medio turbio". Que el incidente fue rápido, y que a los tres o cuatro minutos de las dos personas entrar, sonaron unos tiros. "Una vez oímos los tiros surgió una gritería." Cuando se incorporó, ya todo había pasado. Indicó que llegó ese día al negocio como a las nueve y treinta de la noche y se limitó a estar en el área de la máquina de juegos. Que había estado una sola vez en el negocio y que no sabe de dónde salieron los disparos. A preguntas del Honorable Juez, contestó que la luz iluminaba todo el salón, que estaba como a media luz y señaló: "Nunca los ví, pues yo estaba de espaldas cuando entraron los que fuesen, no miré para atrás. Yo me tiré al piso enseguida. Cuando me levanté ya se habían ido".

Bienvenido Ríos Ocasio, conocido por El Indio, declaró que la noche de los hechos, como a las once y treinta de la noche se encontraba en El Escorial, conversando con otras personas. Que sintió un "revolú" y oyó cuando alguien gritó: "Todo el mundo al suelo". Que entonces él se metió en la cocina.

Por otro lado, señaló que acostumbraba ir al negocio y había estado allí como quince veces, por lo que conocía bien el negocio por dentro. Indicó que la iluminación en el sitio

consistía de dos lámparas, una roja y otra amarilla, que cuelgan, despegadas del techo, sobre el mostrador de la barra. (²) Que éstas no alumbran mucho, pero que el sitio no era del todo oscuro. Que la lámpara amarilla estaba a la izquierda y la roja a la derecha. Que no hay lámparas fluorescentes en el salón. Que al sonar los disparos ya se encontraba en el piso de la cocina, que todo ocurrió rápido, "En un abrir y cerrar de ojos". Que ayudó a cargar a las víctimas y fue al hospital con una de ellas. Que no le vio el rostro a ninguna de las dos personas que entraron al lugar. Indicó que desde la barra a la puerta es difícil, aunque no imposible, verle la cara a alguien que está en la puerta del negocio.

A preguntas del fiscal, indicó que el sitio no estaba alumbrado, pero tampoco estaba oscuro. Que las lámparas en el negocio tienden a caer hacia abajo desde el techo y quedan despegadas "bastante alto" de la barra. Que no estaba seguro, en sí, de la posición de las lámparas.

Señaló que escuchó el tiroteo como a los tres minutos de entrar las dos personas. Que él se fue hacia la cocina y se tiró al piso. Que luego de esto, una muchacha que estaba allí le pidió auxilio y él ayudó a llevar a los heridos al hospital. Que de allí fue al cuartel donde le preguntaron sobre lo sucedido esa noche. A preguntas del fiscal, manifestó que, aunque era difícil, se podía ver lo suficiente como para distinguir a una persona.

El último testigo lo fue el agente del Negociado de Investigación Criminal, Julio Santos. No fue testigo ocular. Éste indicó que llegó al sitio de los hechos a las doce y treinta de la madrugada del día 28 de julio de 1978. Identificó varias fotografías del lugar, a requerimiento de la defensa. Señaló que entrevistó varios testigos y los llevó al Cuartel General,

---

(²) El *Exhibit* 3 de la defensa, el cual obra en autos, consiste de una fotografía tomada por la Policía en el lugar de los hechos a raíz de los acontecimientos. La fotografía presenta una vista del lugar de la barra, una columna al frente, y, al fondo, parcialmente oculta, una lámpara redonda y oscura que cuelga del techo, casi sobre el mostrador.

pero se fue debido a que tenía que continuar con la investigación.

Terminada la presentación de la prueba, y luego de rendirse los respectivos informes y darse las correspondientes instrucciones, el jurado se retiró a deliberar, regresando luego a preguntar a través de su presidente cómo se hizo la identificación del apelante. El juez de instancia procedió a hacer un recuento de lo que sucedió en el caso, manifestando: "Sobre de dónde salió el retrato con que identificaron al imputado, sobre eso los dejo a ustedes que hagan la inferencia que ustedes crean pertinente".

Luego del incidente, el jurado se retiró a deliberar nuevamente.

Hace algunos años, establecimos la norma de que la identificación del acusado es una fase esencial del debido procedimiento de ley. En *Pueblo* v. *Gómez Incera*, 97 D.P.R. 249, 252 (1969), dijimos: "No puede haber un juicio justo e imparcial si no se garantiza debidamente la forma de identificar a la persona que se acusa de la comisión de un crimen. Los mayores extravíos en la administración de la justicia lo ocasionan los errores en la identificación de los acusados. Se apunta que en un estudio de sesenta y seis casos resueltos, en veintinueve de ellos se identificó erróneamente al acusado. Ver Borchard, *Convicting the Innocent* (Garden City, 1932); Williams & Hammelmann, *Identification Parades-I*, 1963, Crim. L. Rev. 479".

Lo que expresamos entonces tiene hoy igual o mayor pertinencia. Así lo entendió la Asamblea Legislativa al adicionar la Regla 252 a las de Procedimiento Criminal. Si bien es cierto que normalmente es preferible que se identifique al presunto responsable del hecho delictivo mediante el procedimiento sancionado en *Gómez Incera*, y hecho ley mediante la aprobación de la regla antes mencionada, pueden mediar situaciones como apuntamos en el propio caso de *Gómez Incera*, en que la identificación puede resultar confiable sin que se utilice la

rueda de confrontación. Esto es en armonía con el criterio central de que hay que analizar cada caso con atención a la totalidad de las circunstancias.

Recientemente, en *Pueblo* v. *Peterson Pietersz*, 107 D.P.R. 172 (1978), el Tribunal acogió los criterios de *Neil* v. *Biggers*, 409 U.S. 188 (1972), y *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), para analizar la suficiencia y confiabilidad de la identificación de un sospechoso en esos casos. Los criterios incluyen la oportunidad que tuvo el testigo de observar al criminal al momento de los hechos, el grado de atención prestada por el testigo, la fidelidad de la descripción del criminal dada previamente por el testigo, el grado de certeza demostrado por el testigo en la confrontación, y el tiempo transcurrido entre los hechos y la confrontación. Ninguno de estos criterios por sí solo es determinante. Su utilidad es manifiesta únicamente cuando se analizan en conjunto.

### 1. *Oportunidad de observar*

El asalto ocurrió casi a medianoche, en una barra al costado de la Calle Arzuaga de Río Piedras. Los asaltantes no habían estado en el lugar bebiendo ni comiendo, sino que irrumpieron de improviso. Mataron y se fueron. No eran conocidos de la testigo.

Aunque no usaba disfraz que ocultara su rostro, el individuo a quien la testigo señala como el apelante, usaba una gorra de pescador, de esas que tapan las orejas y el pelo dejando al descubierto sólo el rostro bajo la visera.

Los testigos oculares coinciden en que la luz era turbia, pues provenía de bombillas de colores, no claras. La única persona de las presentes que desmiente el hecho es Myrna Luz, quien alegó que el sitio estaba bastante claro, pues estaba iluminado con lámparas fluorescentes. Lo curioso de este testimonio es que Myrna Luz alegó no recordar si en el sitio había bombillas de colores, a pesar de que, para el día de los hechos, hacía dos meses que trabajaba allí. En este punto tan crucial, su testimonio fue selectivamente amnésico.

Es en estas condiciones que Myrna Luz alega que pudo observar al de la gorra como a ocho pies de distancia. Como se ve, su observación no es cara a cara. Más aún, de la propia evidencia surge la duda en cuanto al lugar exacto en que ésta se hallaba respecto a una columna, pues su propio testimonio la ubica unas veces detrás y otras veces al lado de la columna.

En cuanto al tiempo de duración de su observación, también la prueba revela serias dudas. A pesar de su insistente reclamo de que su observación fue de cinco o seis minutos, el experimento efectuado en corte abierta revela su deficiencia en calcular adecuadamente el tiempo. De allí que lo calculado en seis minutos, fue cronometrado en tres por el tribunal. Los demás testigos coinciden en que todo pasó rápido, "en un abrir y cerrar de ojos". "Un abrir y cerrar de ojos" no es suficiente tiempo de observación para identificar positivamente a nadie.

Todas estas circunstancias son distintas a las de *Peterson Pietersz*, pues allí el asalto ocurrió a las cinco de la tarde, en pleno día, en buenas condiciones de visibilidad y sin pieza alguna que ocultara siquiera parcialmente el rostro o la cabeza de los asaltantes. Los testigos de identificación pudieron observar por largo rato (media hora) a los delincuentes, les sirvieron comida en el lugar y uno de los testigos tuvo de frente a Peterson Pietersz. Fueron circunstancias de inmediatez física con amplia oportunidad de ver y observar.

### 2. *Grado de atención*

Myrna Luz se quedó "paralizada". Tanto así, que cuando uno de los asaltantes ordena a todo el mundo lanzarse al suelo, ella permanece de pie y es incapaz de seguir tan sencilla instrucción. Es por el "empujón" que le da uno de los testigos, que Myrna Luz viene a parar finalmente al piso. Este estado anímico debe asociarse con el terror que súbitamente invade a una persona en inminente peligro de grave daño físico o de muerte. Lo que la testigo describe como quedarse "paralizada" implica una desconexión con el mundo exterior, a tal punto

que es incapaz de responder a estímulos exteriores. Ciertamente en este estado no puede observar y retener sus observaciones para luego comunicarlas.

Nótese que ella no pudo siquiera describir la vestimenta de los malhechores, excepto por la gorra amarilla que, como veremos, fue la pieza que la Policía ocupó a posteriori en el piso del lugar de los hechos. Más aún, la testigo ni siquiera se fijó en el otro individuo, en "el de alante", que fue el que se paseó por dentro del local a la vista de todos.

### 3. *Fidelidad de la descripción*

El problema con este criterio es que no se satisfizo. La testigo no suministró descripción alguna al policía que investigó los hechos ni al fiscal que tomó su declaración jurada, a pesar de que, cuando se le pregunta sobre la ropa que vestía la persona que se quedó atrás, manifiesta que no recuerda "porque yo lo más que miré fue la cara", pero no consignó en la declaración jurada descripción alguna. Confrontada con ese hecho durante el juicio, Myrna Luz pretendió en un momento dado explicar esas y otras omisiones a base de que ella lo declaró, pero no lo copiaron. El argumento es insostenible. Ese es el tipo de dato que un fiscal jamás omite cuando se está investigando un doble asesinato cometido por desconocidos. La única explicación racional y lógica es que Myrna Luz nunca estuvo en condiciones de hacer una identificación confiable.

Lo que Myrna Luz declaró con ahínco es que el individuo que se quedó parado en la puerta, el "de atrás", llevaba puesta una gorra amarilla. Curiosamente este hecho coincide con el hallazgo de una gorra como la descrita, dentro del local, en el suelo, junto a la puerta.

La mejor evidencia que puede aportar un testigo para demostrar que su identificación del acusado fue producto de su propia observación y no de distorsiones mentales en un momento de tensión o angustia ni de la sugestividad del procedimiento de identificación, es la descripción que pueda hacer

del criminal inmediatamente después de acaecidos los hechos o dentro de un período posterior razonable.

Distinto sucedió en *Peterson Pietersz*, donde los testigos no solamente describieron prontamente el aspecto físico y la voz de los asaltantes, sino que también ofrecieron detalles que permitieron la preparación de bocetos al F.B.I.

### 4. *Nivel de certeza*

El testimonio de Myrna Luz no fue convincente. Si bien es cierto que le presentaron varias rondas de fotografías en las cuales no identificó a nadie, no es menos cierto que su identificación se produce luego de que la Policía ha recibido una confidencia sobre quién es el culpable, y lo retrata.

Las fotografías que le presentan a Myrna Luz no son de personas de características físicas similares. No se levantó acta alguna como manda la ley. Más aún, se utilizó el procedimiento de identificación por fotografías cuando ya había un sospechoso y sin que demostrara una necesidad imperiosa de omitir en primera instancia la rueda de confrontación. Al igual que en *Pagán Hernández* v. *Alcaide*, 102 D.P.R. 101 (1974), este caso demandaba la celebración de una rueda de confrontación. Regla 252.2 de Procedimiento Criminal. Distinto hubiera sido si, como en *Pueblo* v. *Morales Romero*, 100 D.P.R. 436 (1972), la identificación por fotografías se hubiera hecho a los dos o tres días de haber sucedido los hechos y en circunstancias que demostraran plenamente la confiabilidad de la identificación.

### 5. *Tiempo entre el crimen y la confrontación*

El asalto ocurrió el día 27 de julio. La testigo narra que cuando hizo la identificación por fotografías ya "Estábamos en el mes de septiembre", o sea, dos meses después.

Una identificación hecha por fotografías dos meses después, cuando el tiempo de observación fue a lo sumo de tres minutos, en un ambiente inadecuadamente iluminado, la testigo en estado de "paralización", mientras el asaltante usaba

una gorra de pescador que incluso le cubría las orejas y el pelo, y en ausencia total de siquiera una descripción general del asaltante a raíz de los acontecimientos, no puede servir de base a varias convicciones por delito, sin que ello viole el debido procedimiento de ley.

El hecho más elocuente de la dudosa confiabilidad de la identificación hecha por la única testigo de cargo lo revela la minuta del 9 de marzo de 1979, día de las deliberaciones del jurado:

Los Jurados regresan a Sala a las 4:00 P.M., informando el Presidente del Jurado que no han podido llegar a veredicto, ya que hay conflicto de la manera que se identificó al acusado y el Tribunal les pregunta si necesitan alguna instrucción especial o se les lea algún testimonio y procede a hacer un resumen de la prueba presentada, retirándose éstos nuevamente al Salón de Deliberaciones a las 4:50 P.M. para continuar deliberando.

Lo que la minuta refiere como "conflicto de la manera [en] que se identificó al acusado" no es otra cosa que duda manifiesta en cuanto a su identificación.

Cierto es que hemos dicho que corresponde al jurado adjudicar la determinación en cuanto a si la identificación es o no confiable. Sin embargo, hemos dicho también que la suficiencia de la prueba es una cuestión estrictamente de derecho que este Tribunal puede y debe resolver. En *Foster* v. *California*, 394 U.S. 440 (1969), el Tribunal Supremo de Estados Unidos expresó que en algunos casos el procedimiento de identificación por testigos oculares puede ser tan defectuoso que hace la identificación constitucionalmente inadmisible como cuestión de derecho. Véase *Pagán Hernández* v. *Alcaide*, supra, pág. 104. El de autos es uno de esos casos.

Estamos conscientes del problema enorme que la criminalidad representa para la sociedad moderna, pero ello no debe ser motivo para que se socaven los derechos fundamentales que se le han reconocido a todo ciudadano, pues, en aras de resolver el problema de la criminalidad, podríamos desarro-

llar un estado policíaco. La Policía, en su válido empeño por resolver el problema que nos agobia, podría intentar pasar por alto las normas procesales que garantiza la Constitución. Precisamente el rol de los tribunales consiste en preservar un adecuado balance, garantizándole al Estado los medios de perseguir el crimen y preservándole a la ciudadanía su libertad y su tranquilidad.

Las convicciones no pueden prevalecer. Procede revocarlas.

—O—

Opinión emitida por el Juez Asociado Señor Díaz Cruz a la que se unen los Jueces Asociados Señores Rigau y Martín.

San Juan, Puerto Rico, a 3 de abril de 1981

El apelante fue convicto en cargos de asesinato en primer grado e infracciones de la Ley de Armas como partícipe en un asalto al restaurant El Escorial, en la Calle Arzuaga de Río Piedras, en el curso del cual dieron muerte a dos clientes sentados a la mesa. Se propone la revocación de las sentencias por falta de confiabilidad en la identificación en un ejercicio que equivale a imponer la particular apreciación de la evidencia oral por este Tribunal, descartando la del jurado que vio y oyó declarar los testigos, y a tal fin entresacando o seleccionando de la exposición narrativa de la prueba elementos o particulares favorables al apelante que ningún crédito merecieron al juzgador de hechos, o que descartó en el proceso de estimación integral que naturalmente precede a la adjudicación de credibilidad.

El veredicto descansa en suficiente identificación del acusado en fotografías, confirmada en rueda de detenidos (*lineup*) en la que el apelante tuvo asistencia y representación de abogado (E.N.P., pág. 6).[1] En nada pudo refutar

---

[1] Recordamos que en *Manson* v. *Brathwaite*, el Estado contaba con un agente como su único testigo quien identificó al acusado a través de una

esa prueba el testimonio del testigo presentado por la defensa quien declaró que oyó tiros y gritos, y que, citamos: "Nunca los vi, pues yo estaba de espaldas cuando entraron los que fuesen, no miré para atrás. Yo me tiré al piso enseguida. Cuando me levanté ya se habían ido".

Después de *Pueblo* v. *Peterson Pietersz*, 107 D.P.R. 172 (1978), y *Manson* v. *Brathwaite*, 432 U.S. 98 (1977), es nostálgica la insistencia en regresar a la era de tecnicismos, máxime si ha habido una aceptable identificación por fotografías y línea de confrontación. No hay que exigir tanto que una sencilla mesera de restaurant, que a riesgo de su tranquilidad y de su vida sirve a la justicia y a su conciencia como en pocos casos de asesinato y robo hoy en día, señalando al homicida primero en la fotografía, y luego en el Tribunal. Su declaración mereció crédito al jurado y contiene los elementos de confiabilidad que señalamos en *Peterson*, supra, a saber:

1. *Oportunidad de observación.*

Myrna Luz Fermaint, única testigo de identificación, trabajaba la noche de autos atendiendo la barra del restaurant El Escorial. Vio al apelante de frente entrar y sacar una pistola; tenía el rostro descubierto y ella "le miró la cara". El tiempo de observación fue comprobado mediante experimento en el tribunal como 3 minutos (duración de un round de boxeo); el testigo de defensa José Moya dijo que a los 3 ó 4 minutos de entrar los asaltantes oyó los tiros y gritería; otro testigo de defensa, Bienvenido Ríos declaró que escuchó el tiroteo a los tres minutos de entrar dichos individuos.

El restaurante tenía suficiente alumbrado, según los propios testigos de defensa antes mencionados: Moya declaró a preguntas del juez que la luz iluminaba todo el salón; Ríos coincidió diciendo que no es imposible para quien está en la

---

sola fotografía tomada de los archivos de la Policía y no hubo línea de sospechosos. La identificación fue sostenida como confiable.

barra verle la cara a alguien que está en la puerta del negocio; que se podía ver lo suficiente para distinguir a una persona. Y María Olmo, otra empleada del Escorial, llamada por la defensa declaró que a la distancia comprendida desde la silla de los testigos a donde se situó el fiscal junto al jurado se podía ver claramente.

Notamos que el criterio en contrario resume estas declaraciones en forma argumentativa prefiriendo puntos aislados que convendrían al acusado pero que evidentemente no merecieron credibilidad al jurado. No es misión de este Tribunal llegar a conclusiones distintas a las que sustentan el veredicto de culpabilidad con particulares de prueba tan explícita aportada por el propio apelante.

2. *Grado de atención de la testigo.*

Atención era precisamente el trabajo de la mesera Myrna L. Fermaint. Para que estuviera atenta le pagaba su patrono. El despacho en la barra exige vigilancia. Le miró y le vio bien la cara al apelante captando su fisonomía, aun cuando se asustara. (¿Podrán ser testigos creíbles únicamente los que no se asusten con dos asesinatos cometidos en su presencia? El jurado contestó la pregunta con su veredicto.) Que su concentración en los rasgos del acusado fue buena quedó demostrado en la investigación, pues confrontada con numerosas fotos y fichas de la Policía en ninguna de las cuales aparecía el apelante, así lo manifestó; identificándolo sin vacilación como el hombre con gorra de pescador cuando finalmente se le exhibió el retrato de éste.

3. *Fidelidad en la descripción.*

La otra opinión capitaliza otra vez en forma selectiva la falta de recuerdo en la testigo Myrna de algunos detalles, como el de ropa que vestían los asaltantes. Si la testigo dice que concentró en la cara del intruso, (porque ¿qué otra cosa le va a mirar a quien entra anunciando un asalto y sacando una pistola?) la exigencia de que recordara su vestimenta

va más allá no digo de la capacidad intelectual de la cantinera, sino de los simples reflejos que activa el instinto de conservación. Si el apelante hubiera sido cojo, probablemente ella hubiese dicho que tampoco se había fijado en su defecto. El requisito de fidelidad en la descripción se cumplió con la honrada (y valiente) identificación de aquel rostro en la fotografía. Que su identificación del apelante se manifestara mejor por su percepción visual de la foto, es explicable porque no todo el mundo tiene la capacidad verbal para describir una mirada, un semblante o el conjunto de rasgos que le imparte una particular identidad facial a una persona. De hecho es más confiable la identificación por la imagen que se repite en la fotografía, que la vinculada al relato que se hace a los investigadores. Precisamente sobre ese principio es que descansa la utilidad de la rueda de detenidos.

4. *Nivel de certeza.*

Este criterio fue revalidado en la declaración de Myrna según los apuntamientos que anteceden. Insistimos en que debe añadirse como factor de certeza y seguridad en su declaración el hecho de que representa la vindicación de la justicia y la lealtad a una conciencia tan intensa en su llamado que la hace olvidarse del peligro de represalia contra su persona, elemento éste de temor que derrota la investigación criminal en nuestro medio y que tiene todo el sistema al borde del descrédito.

5. *Tiempo transcurrido entre crimen y confrontación.*

No parece que llegue a los dos meses si el asalto se produjo el 27 julio y la identificación por fotografías tuvo lugar en septiembre. Cinco o seis semanas no borran el conjunto general de rasgos y gesto de una cara vista de frente, con suficiente claridad en las circunstancias traumáticas de este caso. El modo en que la impresión fuerte tiende a esculpir su recuerdo en la memoria humana perdura mucho más allá de estas semanas transcurridas.

Sorprende la opinión en contrario al impugnar el veredicto porque el jurado solicitara instrucciones adicionales sobre la declaración de la testigo. Y más todavía clasificando la identificación como "constitucionalmente inadmisible" donde como aquí ha habido identificación por fotografía, *confirmada* en rueda de detenidos en la cual el acusado estuvo representado por abogado. Ya está resuelto:

El Tribunal Supremo de los Estados Unidos en lo que ya constituye doctrina firme asentada en reiterados pronunciamientos de su jurisprudencia, ha descartado la sugestión o insinuación como elemento que por sí solo ofende el debido proceso de ley y obliga a la exclusión de prueba de identificación. *Simmons* v. *United States,* 390 U.S. 377 (1968); *Foster* v. *California,* 394 U.S. 440 (1969); *Coleman* v. *Alabama,* 399 U.S. 1 (1970). La norma vigente hace depender la confiabilidad de la identificación de la "totalidad de las circunstancias", aun cuando el procedimiento de confrontación haya sido sugestivo. Se señalan como factores principales que deben guiar la posibilidad de un error de identificación la oportunidad que tuvo el testigo de observar al ofensor al tiempo en que cometía el crimen, el grado de atención del testigo, la corrección de la descripción previa del criminal por el testigo, el nivel de certeza demostrado por el testigo en la confrontación, y el tiempo transcurrido entre el crimen y la confrontación. *Neil* v. *Biggers,* 409 U.S. 188, 199 (1972). La admisión de testimonio relativo a un procedimiento sugestivo e innecesario de identificación, no viola el debido proceso siempre y cuando la identificación tenga suficientes elementos de confiabilidad. *Manson* v. *Brathwaite,* 432 U.S. 98 (1977), supra. La decisión en *Moore* v. *Illinois,* 434 U.S. 220 (1977) excluye la prueba de identificación porque se obtuvo ya iniciado el proceso criminal adversativo, sin que el acusado estuviera asistido de abogado, situación que no confrontamos en el presente caso. *Pueblo* v. *Peterson Pietersz,* supra, pág. 183.

En la amplia y abarcadora estimación de credibilidad, no podía haber otro veredicto que el de culpabilidad para un hombre cuya única defensa en un doble asesinato fue si había más o menos lámparas en el local y que la testigo se "paralizó" al verlo. La prueba del acusado *no negó la acusación de*

*asesinato.* Es vana pretensión hallar falta en el veredicto del jurado, si a tal grado fue deficiente la base de defensa del acusado. En el lenguaje de *Brathwaite* las vacilaciones de la opinión opuesta se rechazan, al sentenciar:

De todos modos no podemos decir que bajo todas las circunstancias de este caso exista "una substancial probabilidad de error irreparable en la identificación". [*Simmons* v. *United States*, 390 U.S. a la pág. 384, 19 L.Ed.2d 1247.] Hasta ese punto, tal evidencia debe ser considerada por el jurado. Nos satisface poder depender del buen sentido y juicio de los jurados americanos, toda vez que prueba con algún elemento indigno de confianza es grano de todos los días para el molino del jurado. Los jurados no son tan susceptibles que no puedan evaluar inteligentemente el peso de un testimonio de identificación que tiene algún aspecto cuestionable. *Pueblo* v. *Peterson Pietersz,* supra, pág. 184.

Ésa es también la posición de este Tribunal hace siete años, adoptada con la convicción jurídica y moral que impulsó la reconsideración en *Pueblo* v. *Suárez Sánchez,* 103 D.P.R. 10, 21–22 (1974) al expresar:

El juez de instancia concluyó que en la suma de circunstancias de este caso es confiable y digna de crédito la identificación del acusado, por lo que resultaba de todo punto innecesario recurrir a la rueda de detenidos. Su apreciación sostenida por la prueba ha de ser estimada por este Tribunal. La identificación de criminales no está exenta de la sabia norma que detiene y restrinje la intervención de los tribunales de apelación frente a la mejor posición del juez de instancia para adjudicar credibilidad debiendo suplantar sus determinaciones únicamente cuando no estén sostenidas por la prueba. En la aplicación de ese principio no se puede depender de matices, tonalidades y esmeros y sí de la realidad esencial, del signo conocible que en el proceso racional conduce al juez de instancia a la determinación que satisface su conciencia de juzgador de otro hombre.

Por resultar la identificación enteramente confiable en la estimación integral de todos sus elementos y porque la prueba del acusado no negó las graves acusaciones, el veredicto del jurado debe ser sostenido y las sentencias confirmadas.