*1107 TEXTO COMPLETO DE LA SENTENCIA
I
El apelante, Miguel Rodríguez Benabe (en adelante, “Rodríguez Benabe”) solicita mediante su Escrito de Apelación presentado el 13 de agosto de 2004, a las 10:20 a.m. (KLAN-2004-00972), la revocación de las sentencias impuestas el 16 de julio de 2004, por el Tribunal de Primera Instancia, Sala de Carolina, Hon. Ángel D. Ramírez Ramírez, Juez, por infracción al Artículo 95(h) del Código Penal de 1974, 33 L.P.R.A. § 4032(h), y al Artículo 4.05 de la Ley de Armas, 25 L.P.R.A. § 458(d), Casos Criminales Núms. FIC2001G0054 y FLCA2001G0357, respectivamente. Por su parte, Warner Barahona Gaetán (en lo sucesivo, “Barahona Gaetán”) solicita, por propio derecho, mediante su Escrito de Apelación presentado el 13 de agosto de 2004, a las 2:59 p.m. (KLAN-2004-00975), la revocación de las sentencias impuestas por el referido magistrado, el 16 de julio de 2004, por infracción al Artículo 95(h) del Código Penal de 1974, 33 L.P.R.A. § 4032(h), y al Artículo 4.05 de la Ley de Armas, Casos Criminales Núms. FIC2001G0050 y FLA2001G0353. Por otro lado, Luis Rivera Gómez (en adelante, “Rivera Gómez”) solicita mediante su recurso de Apelación presentado el 13 de agosto de 2004, a las 6:02 p.m. (KLAN-2004-00981), la revocación de las sentencias impuestas el 23 de marzo de 2004, por infracción al Artículo 95(h) del Código Penal de 1974, 33 L.P.R.A. § 4032(h), y al Artículo 4.05 de la Ley de Armas, 25 L.P.R.A. § 458(d), Casos Criminales Núms. FIC2001G0056 y FLCA2001G0359, respectivamente. Por último, Emmanuel Ojeda Carrión (en lo sucesivo, “Ojeda Carrión”) solicita mediante Escrito de Apelación presentado el 1 de octubre de 2004, a las 2:01 p.m. (KLAN-2004-01158), la revocación de las sentencias impuestas el 3 de septiembre de 2004, por el referido magistrado, por infracción al Artículo 95(h) del Código Penal de 1974 (dos casos), 33 L.P.R.A. § 4032(h), y al Artículo 4.05 de la Ley de Armas (dos casos), 25 L.P.R.A. § 458(d), Casos Criminales Núms. FIC2001G0051 y 0052 y FLCA2001G0354 y 0355, respectivamente. Al referimos individualmente a los apelantes, los identificaremos como previamente lo hemos hecho; al referimos a ellos en conjunto, los identificaremos como los apelantes.
El 26 de agosto de 2004, en atención a Moción Urgente Solicitando Consolidación presentada por Rivera Gómez el 17 de agosto de 2004, en su recurso KLAN-2004-00981, mediante Resolución ordenamos la consolidación del recurso KLAN-2004-00972, presentado por Rodríguez Benabe; del recurso KLAN-2004-00975, presentado por Barahona Gaetán; y del recurso KLAN-2004-00981, presentado por Rivera Gómez. Por último, concedimos a los apelantes cuarenta y cinco (45) días para presentar una transcripción privada de la prueba, a tenor con la Regla 76 de nuestro Reglamento, 2004 J.T.S. 112, a las páginas 1,343-44.
Mediante Resolución del 19 de octubre de 2004, concedimos término adicional de cuarenta y cinco (45) días a Rodríguez Benabe, para presentar la transcripción privada de la prueba, según solicitado el 10 de octubre de 2004. En atención a Moción Asumiendo Representación Legal y Solicitud de Consolidación presentada por Ojeda Carrión, consolidamos su recurso KLAN-2004-01158, con los ya previamente consolidados el 26 de agosto de 2004.
*1108 El 9 de diciembre de 2004, los apelantes presentaron Moción Informativa en Relación a Transcripción de Evidencia y la Moción en Solicitud de Remedio y Orden. Planteaban, en síntesis, el mal estado en que se encontraban las regrabaciones de los procedimientos ante instancia; solicitaban que fuese instancia el que preparara la transcripción, comprometiéndose a satisfacer, si fuese necesario, cualquier gasto o costo en su preparación. En consideración a lo cual, el 23 de diciembre de 2004, emitimos Resolución instruyendo a la Secretaría del Tribunal de Primera Instancia, a que dentro de los diez (10) días de la notificación, permitiese a la representación legal de los apelantes, o a quienes designaren, escuchar las grabaciones a los fines de tomar notas sobre aquellas porciones omitidas en las regrabaciones entregadas, de forma tal que se pudiese corregir la transcripción.
El 29 de diciembre de 2004, Rodríguez Benabe, Ojeda Carrión y Barahona Gaetán, presentaron escrito titulado Moción en Cumplimiento de Orden y Reconsideración, informando sobre los arreglos con la Secretaría del Tribunal de Primera Instancia para escuchar las grabaciones, conforme a nuestra Orden de 23 de diciembre de 2004. Por otro lado, solicitaron reconsideración a la referida orden, a los fines de que ordenáramos a la Secretaria del Tribunal de Primera Instancia, preparar la transcripción de evidencia, sufragando ellos los gastos. El 19 de enero de 2005, tomamos conocimiento de lo informado por los apelantes en su Moción Informativa de 13 de enero de 2005. No entramos en los méritos de la reconsideración por haberse tomado académica.
Así las cosas, el 1 de julio de 2005, Rodríguez Benabe y Ojeda Carrión, presentaron Moción Informativa dejándonos saber haber presentado la transcripción de evidencia correspondiente a siete (7) días de juicio, con excepción del pronunciamiento de sentencia de Ojeda Carrión, debido a no haber recibido la regrabación del incidente. Mediante Resolución del 6 de julio de 2005, informamos quedar enterado de su contenido. En Resolución del 8 de julio de 2005, concedimos al Pueblo de Puerto Rico, hasta el 30 de agosto de 2005, para reaccionar a las transcripciones presentadas por los apelantes.
Luego de varias prórrogas y de otros trámites procesales, la transcripción de los incidentes del juicio fue concluida y presentada; así lo reconocimos en nuestra Resolución del 10 de enero de 2006. Mediante el dictamen concedimos al Tribunal de Primera Instancia veinte (20) días para elevar y hacemos llegar los autos originales, incluyendo toda la evidencia presentada. Por otro lado, concedimos a los apelantes treinta (30) días, contados a partir de la notificación de la Resolución, para presentar sus respectivos alegatos.
El Alegato de Rivera Gómez fue presentado el 24 de marzo de 2006, luego de lo cual, mediante Resolución del 31 de marzo de 2006, concedimos al Procurador General treinta (30) días, a partir de la notificación, para presentar su alegato, en cuanto a Rivera Gómez concernía. En respuesta a lo ordenado, el Procurador General presentó una Moción en Solicitud de Remedio, solicitando que tratándose de cuatro (4) casos consolidados, se le permitiera presentar su alegato luego de presentados los de todos los apelantes. Concedimos el remedio solicitado mediante Resolución del 10 de abril de 2006.
Finalmente, los alegatos de Rodríguez Benabe y Ojeda Carrión se presentaron el 28 de junio de 2006, mientras que el de Barahona Gaetán se presentó el 29 de junio de 2006. Constando en autos los alegatos de los apelantes, emitimos Resolución el 30 de junio de 2006, concediendo al Procurador General treinta (30) días, contados a partir de la notificación, para presentar su alegato, cosa que hizo el 12 de diciembre de 2006. Posteriormente, recibimos los autos originales del caso, que constan, entre otros, de treinta y un (31) tomos para un total de quinientos un (501) folios, un (1) bulto negro y tres (3) sobres manila, conteniendo evidencia.
Así pues, el 22 de diciembre de 2006, Rodríguez Benabe, Ojeda Carrión y Barahona Gaetán, solicitaron la celebración de una vista oral, a los fines de que estuviésemos en mejor posición de resolver el recurso. Por su parte, el Procurador General se opuso a lo solicitado mediante Réplica a “Moción Solicitando Vista Oral”, presentada el 4 de enero de 2007. Mediante Resolución del 18 de enero de 2007, declaramos No Ha Lugar la celebración de vista oral. Por su parte, el 6 de febrero de 2007, Rodríguez Benabe, Ojeda Carrión y Barahona *1109 Gaetán solicitaron reconsideración, la que denegamos posteriormente.
En resumen, los apelantes nos solicitan la revocación de las sentencias impuestas por el Tribunal de Primera Instancia, Sala de Carolina, Hon. Ángel D. Ramírez Ramírez, Juez, constituido en tribunal de derecho, declarándolos culpables y convictos por infracciones a los Artículos 95(h) del Código Penal de 1974, 33 L.P.R. A. § 4032 (h), y Artículo 4.05 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. § 458 (d).
Estudiados los alegatos, analizados los autos originales y la evidencia admitida, observada una cinta videomagnetofónica, examinada la voluminosa transcripción de la prueba testifical contenida en veinticinco (25) tomos (T.E.), el derecho y la jurisprudencia aplicable, resolvemos.
II
Los hechos que dieron margen a la presentación de acusaciones contra los apelantes y otros dos, a saber, los agentes Javier Hernández Vélez y Luis Rivera Rojas, tienen su génesis el 17 de junio de 2001, al estarse celebrando un cumpleaños en las facilidades del Centro Vacacional de la Unión Independiente de Acueductos (UIA) en Loíza. Durante el cumpleaños se suscitó una pelea entre dos (2) féminas, a saber, Gisela Matos Osorio y Carmen Waleska Rivera Rodríguez, razón por la cual, la administradora de dicha facilidad, Irma Feliú Miranda, decidió llamar a la policía, dada la gran cantidad de personas que allí se encontraban. Al comunicarse con el Cuartel de la Policía de Loíza, la administradora Feliú Miranda adujo que en el lugar había un conato de motín. T.E. de 21 de octubre de 2003, págs. 100-118, 120-121. En consideración a la información suministrada, de Cuartel de Loíza solicitó la intervención de la División de Operaciones Tácticas de la Policía de Puerto Rico de Carolina (DOT).
Al llegar al Centro, los agentes de la DOT fueron recibidos con botellas mientras dialogaban con la administradora Feliú Miranda y la anfitriona de la actividad, Marta I. Vázquez Molina. Durante su intervención, los agentes de la DOT ocuparon sustancias controladas al señor Roberto Rivera Martínez, hechos por lo cuales se presentaron posteriormente, contra éste, varias acusaciones. Los agentes de la DOT arrestaron también a Luis E. Vázquez Ortiz por amenazar a los agentes provocándose un motín, cargo que posteriormente fue archivado y sobreseído a petición del Ministerio Público mediante Sentencia de 2 de noviembre de 2001.
De otra parte, a los apelantes, en aquel entonces agentes del orden público asignados a la DOT, se les denunció por su intervención del 17 de junio de 2001. Se les imputó: a) haber empleado fuerza o violencia utilizando un rotén, contra los señores Roberto Rivera Martínez y Luis A. Romero Torres, actuando so color de autoridad y sin causa legítima; y b) sin motivo justificado haber utilizado un rotén contra los ya mencionados, en la comisión del delito de agresión agravada grave, sin haberse utilizado como instrumento propio de un arte, deporte, profesión, ocupación, oficio o por condición de salud, incapacidad o indefensión haciendo uso ilegal del mismo. Es menester señalar que en la vista preliminar celebrada, el tribunal no encontró causa probable para acusar a Barahona Gaetán, Rodríguez Benabe, Ojeda Carrión y Rivera Gómez en cuanto a los cargos en los que la señora Miriam Martínez Couvertier figuró como perjudicada. Tras los procedimientos posteriores, se presentaron las acusaciones correspondientes, luego de lo cual, el juicio en su fondo comenzó el 29 de septiembre de 2003, continuando durante los meses de octubre, noviembre y diciembre de ese mismo año, extendiéndose al 25, 26 y 27 de febrero, y 5 y 23 de marzo de 2004.
El Ministerio Público presentó los testimonios de: 1) Roberto Rivera Martínez; 2) Marcos Andrades Cruz; 3) Gloribel Rijos Osorio; 4) Sonia D. Torres Pérez; 5) Marta I. Vázquez Molina; 6) René García Rivera; 7) Ledo. Ramón A. Llovet García; 8) Diliana Crespo Talayeras; 9) Vimarie Hernández Morales; 10) Ignacio Acevedo Cardona; 11) Darling H. Guzmán Espaillat; 12) Luis E. Vázquez Ortiz; 13) Luis A. Romero Torres; y, 14) Miriam Martínez Couvertier. La testigo Mabel Velázquez Díaz, Directora Interina de la División de Nombramientos de la Policía, fue excusada por el Tribunal, toda vez que las partes estipularon su testimonio.
*1110 Finalizada la prueba del Ministerio Público, los apelantes presentaron prueba de defensa, consistentes en el testimonio de la agente Damaris Rodríguez Hernández, del agente George Vega Mangual, la señora Feliú Miranda, y Rodríguez Benabe.
A. Prueba del Ministerio Público:
1. Testimonio de Roberto Rivera Martínez:
Rivera Martínez declaró, que el día de los hechos llegó al Centro Vacacional del Municipio de Loíza alrededor de las 2:00 p.m., acompañado de su señora madre, Miriam Martínez Couvertier, su hermana Miriam Rivera Martínez, su sobrino, Héctor Aponte y un amigo de su hermana. Aproximadamente, a las 7:00 p.m. salió de la actividad para buscar a su cuñado, Darling H. Guzmán Espaillat, quien no sabía cómo llegar al Centro Vacacional. Al regresar, la policía estaba en el Centro Vacacional. Entró al salón de actividades y se dirigió a la mesa donde estaba sentada su señora madre. Luego, salió a fumarse un cigarrillo y observó a seis policías que conversaban con la señora Marta I. Vázquez Molina, anfitriona de la actividad, y la señora Irma Feliú Miranda, administradora del local. Estaba aproximadamente a 30 pies de ellos y vio al padre de Marta, el señor Luis Vázquez Ortiz, levantarse del piso. Se acercó a ellos y le dijo a la señora Vázquez Molina que entrara al local porque ahí no había pasado nada. Agregó que en ese momento, Barahona Gaetán lo mandó al carajo y él le dijo que le estaba faltando el respeto. Acto seguido, Rodríguez Benabe lo empujó con la macana y cayó al piso. Indicó, que entró al local de espaldas y le dijo a Rodríguez Benabe “que es lo que está pasando”. Caminó hacia el centro del salón donde estaba su madre y, luego, llegó a unas puertas corredizas que dividían el salón. Los agentes lo agredieron hasta que llegó una persona de nombre Gloribel. Véase, T.E. de 29 de septiembre de 2003, págs. 20-30; Contrainterrogatorio T.E. de 1ro de octubre de 2003, págs. 215-242 y 254-263. Luego, los agentes le pusieron las esposas y lo sacaron hacia el área del estacionamiento. T.E. de 29 de septiembre de 2003, págs. 26-30.
Rivera Martínez identificó a los seis agentes en Sala e indicó que Rodríguez Benabe fue el primero que lo agredió. T.E. de 29 de septiembre de 2003, págs. 23, 25 y 26.
Durante el contrainterrogatorio, declaró que: “No estaba contando ni cuántos golpes me daban ni quién me los daba. Yo sé que los seis me estaban dando en ese momento”. La defensa le preguntó porqué sabía que los seis oficiales lo agredieron en el piso. Éste respondió: “Porque ellos son los que andaban juntos, ellos seis. Ellos seis fueron.” Contrainterrogatorio T.E. de 1ro de octubre de 2003, págs. 265-268. Testificó, que Ojeda Carrión, Rivera Rojas y Rivera Gómez lo agredieron cuando estaba con su madre en el área de la pared y que Barahona Gaetán no estaba en ese momento. Contrainterrogatorio T.E. de 1ro de octubre de 2003, pág. 288; Contrainterrogatorio T.E. de 3 de octubre de 2003, págs. 66-67. Véase, además, Contrainterrogatorio sobre el video - T.E. de 17 de diciembre de 2003, págs. 51-53 y 56-58.
2. Testimonio de Marcos Andrades Cruz:
El señor Marcos Andrades Cruz declaró que llegó a la actividad, aproximadamente, a las 4:00 p.m. Salió a fumarse un cigarrillo y llegaron los agentes. Agregó, que los agentes iban detrás de un muchacho vestido de blanco, quién resultó ser Rivera Martínez, pegándole con las macanas. Se dirigió hacia la señora Sonia Torres Pérez, quien estaba al frente de la tarima. Ésta le pidió que tomara la cámara de video y que grabara el incidente. Explicó que comenzó a grabar desde que Rivera Martínez y los agentes entraron al local hasta que llegó donde estaba su madre y hermana. De momento apagó la cámara sin querer. Trató de prenderla, pero no pudo. Guardó la cámara, salió del salón y se la entregó a la señora Torres Pérez. T.E. de 8 de octubre de 2003, págs. 59-63.
Durante el contrainterrogatorio, manifestó que la señora Torres Pérez le pidió que sostuviera la cámara *1111 porque le dolía la mano. Declaró que él no tenía la cámara de video cuando los agentes entraron al local. Éste la tuvo “segundos después”, cuando los policías agredieron a Rivera Martínez en el centro del salón. Contrainterrogatorio Leda. Rivera - T.E. de 8 de octubre de 2003, págs. 102-105.
A preguntas de la defensa, el testigo declaró que la señora Torres Pérez estaba en la tarima cuando le pidió que sostuviera la cámara. Finalmente, declaró que el incidente lo grabó desde la tarima. Contrainterrogatorio Ledo. Rexach - T.E. de 8 de octubre de 2003, págs. 124-125. Véase, además, Contrainterrogatorio Leda. Báez-T.E., de 8 de octubre de 2003, págs. 107-112.
El señor Andrades Cruz no identificó a los agentes que alegadamente agredieron a Rivera Martínez.
3. Testimonio de Gloribel Rijos Osorio:
La señora Gloribel Rijos Osorio, quien es prima de Marta Ivonne, declaró que el día de los hechos llegó al Centro Vacacional, aproximadamente, a las 2:40 p.m. Durante la fiesta, su prima Gisela discutió con una mujer de nombre Waleska y ésta la golpeó en la cara. Alrededor de las 7:00 p.m., salió a fumarse un cigarrillo y vio a los agentes que hablaban con la señora Vázquez Molina. Uno de ellos dijo: “La fiesta se va a acabar ahora”. Ella entró al salón a buscar a su hijo. En ese momento, Rivera Martínez entró al salón y los agentes iban detrás de él. Posteriormente, vio cuando Rivera Martínez pasó a otro salón. Aunque no lo conocía, decidió correr hacia el lugar y se lanzó sobre él para que los agentes dejaran de agredirlo. Declaró, que un policía calvo le rompió la camisa a Rivera Martínez para amarrársela sobre la cabeza y detener la sangre. Finalmente, testificó que se fue en la patrulla con el agente Boirié, un policía calvo, y Rivera Martínez, a quien iban a llevar al hospital. T.E. de 8 de octubre de 2003, págs. 132-141; Contrainteirogatorio Ledo. Calderón - T.E. de 8 de octubre de 2003, págs. 145-151.
Durante el contrainterrogatorio, declaró que Rivera Martínez entró al local y dio alrededor de cinco pasos en retroceso y “le tiran el primer palo, el primer golpe” Luego, lo ubicó cerca de una pared. En ese momento, los agentes lo agredieron. Ella estaba cerca de la tarima y vio un agente, a quien identificó como Ojeda Carrión, que tiraba sillas y mesas. T.E. de 9 de octubre de 2003, págs. 101-104. Finalmente, testificó que habían varios policías en el otro salón. Ojeda Carrión fue quien le quitó la camisa a Rivera Martínez. Rodríguez Benabe, también estaba presente. T.E. de 9 de octubre de 2003, págs. 107-113. Véase, además, Contrainterrogatorio Leda. Rivera - T.E. de 9 de octubre de 2003, págs. 85-114.
4. Testimonio de Sonia Torres Pérez:
La señora Sonia Torres Pérez, madre de Luis A. Romero Torres, declaró que llegó al Centro Vacacional, aproximadamente, a las 4:30 p.m. Entre 7:00 y 7:30 p.m., una persona le dijo a la señora Vázquez Molina que saliera porque la policía estaba afuera. Diez o quince minutos después entró de espaldas al salón un muchacho que vestía una camisa blanca y detrás entró un agente con una macana y lo agredió. Grabó el incidente desde la tarima con una cámara de video. Ésta le dio la cámara al señor Andrades Cruz para que grabara el incidente y salió del local. Luego, el señor Andrades Cruz salió del local y le entregó la cámara. Llevó la cámara al apartamento que tenía alquilado la señora Vázquez Molina en el Centro Vacacional. Al salir del apartamento, una persona se le acercó y le dijo que habían agredido a su hijo. Fue a buscarlo y lo encontró afuera del local con un brazo hinchado. Mientras su hijo estaba sentado en la ambulancia, le señaló al agente que lo había agredido. Indicó que era de estatura mediana, un poco tosco y no tenía cabello. T.E. de 9 de octubre de 2003, T. E„ págs. 124-134.
Durante el contrainterrogatorio, declaró que no pudo identificar a Ojeda Carrión en la rueda de confrontación personal tomada el 28 de junio de 2001. T.E. de 14 de octubre de 2003, págs. 92-96. Véase, Contrainterrogatorio Leda. Rivera - T.E., págs. 59-96. Tampoco pudo precisar quién le dio la cámara antes del *1112 incidente. T.E. de 14 de octubre de 2003, págs. 73-77; Contrainterrogatorio Ledo. Rexach - T.E., págs. 135-145.
5.Testimonio de Marta Ivonne Vázquez Molina:
Declaró que el día de los hechos estaba en el Centro Vacacional para celebrar el cumpleaños de su hija. Cerca de las 4:30 p.m., la administradora del local le dijo que iba a suspender la actividad porque los invitados se estacionaron donde les dio la gana. Como a las 5:30 p.m., una tal Waleska agredió a Gisela. La señora Vázquez Molina le reclamó a Waleska y ésta le dio una bofetada. A las 7:30 p.m., el muchacho de la orquesta le dijo que la administradora del local le había dicho que dijera por el micrófono que se fueran y desalojaran el salón porque ella había llamado a la policía. Posteriormente, su hermano Luis A. Vázquez, le dijo que la policía estaba afuera. Ella salió al estacionamiento e identificó a Barahona Gaetán, a quien conocía porque le había sometido unos cargos criminales a su esposo. Adujo que Barahona Gaetán le dijo que los habían llamado y la fiesta se tenía que acabar. Su padre, Luis Vázquez Ortiz, le preguntó porqué hablaba con los guardias. Barahona Gaetán le dijo que se callara la boca. Acto seguido, el apelante Rodríguez Benabe empujó a su padre con el rotén. En ese momento, Rivera Martínez se acercó y le dijo que entrara. Barahona Gaetán le dijo que se callara y que se fuera para el carajo. Rodríguez Benabe y otros agentes entraron al interior del local y agredieron a Rivera Martínez. T.E. de 14 de octubre de 2003, págs. 161-164. Finalmente, declaró que Barahona Gaetán le dijo qué el era el supervisor esa noche. T.E. de 14 de octubre de 2003, pág. 169.
Durante el contrainterrogatorio, expresó que su hermano grabó parte de la actividad con la cámara de video. Contrainterrogatorio Ledo. Rexach - T.E. de 15 de octubre de 2003, págs. 147-148. Indicó que la señora Torres Pérez desistió de grabar la actividad cuando vio a los policías. Contrainterrogatorio Ledo. Valle- T.E. de 15 de octubre de 2003, págs. 168-170. Declaró que Barahona Gaetán estaba hacia la derecha en la entrada del salón cuando ella entró. Contrainterrogatorio Ledo. Valle - T.E. de 15 de octubre de 2003, págs. 180-181. También, testificó que un policía alto, grande, tosquito y blanquito, que resultó ser Rodríguez Benabe, le dio a Rivera Martínez con el rotén. Rivera Martínez entró al salón, le siguió Rodríguez Benabe y todos los agentes entraron detrás. Contrainterrogatorio Leda. Rivera - T.E. de 16 de octubre de 2003, págs. 28 y 30. Luego, Rivera Martínez llegó donde estaba su madre y los agentes los acorralaron en la pared. Especificó, que Ojeda Carrión, a quien describió como calvo y chiquito, agredió a la madre de Roberto. Contrainterrogatorio Contra. Leda. Rivera - T.E. de 16 de octubre de 2003, págs. 32-39.
La señora Vázquez Molina no identificó al agente Ojeda Carrión en la rueda de confrontación personal. T. E. de 16 de octubre de 2003, pág. 59.
6. Testimonio de René García Rivera:
El señor René García Rivera, quien era editor de noticias del Canal 4 al momento de los hechos, declaró que le asignaron transferir el video de la actividad al formato que se usaba en la estación. No pudo certificar que el video que estaba dentro de la cámara era el mismo que se mostró en Sala.
7. Testimonio del Ledo. Ramón Llovet García:
Testificó que el día después de los hechos conversó con la señora Vázquez Molina y la señora Torres Pérez sobre el incidente. El 22 de junio de 2001, recibió una llamada del fiscal Héctor Montañez quien le dijo que quería quedarse con el video para fines investigativos. El licenciado Llovet García le expresó que quería ver el video en su totalidad, por lo que el fiscal accedió a su solicitud. El 25 de junio de 2001, la señora Vázquez Molina y la señora Torres Pérez le llevaron el video con todo el equipo necesario para verlo en su oficina. El 26 de junio de 2001, entregó el video en el Negociado de Investigaciones Especiales del Departamento de Justicia (NIE). El agente Ignacio Acevedo Cardona sacó dos (2) copias en formato VHS. El licenciado Llovet García se *1113 quedó con una copia y la otra se quedó en el NIE. T.E. de 20 de octubre de 2003, págs. 7-14.
8. Testimonio de la agente Diliana Crespo Talayeras:
La agente Diliana Crespo Talayeras trabajaba en la División de Integridad Pública, Sección de Derechos Civiles del NIE para la fecha de los hechos, e investigó el incidente junto a la agente Vimarie Hernández Morales.
Declaró que el NIE asumió jurisdicción en el caso el 21 de junio de 2001. Se le asignó la investigación el 22 de junio del mismo año y, luego, se entrevistó con las fiscales Cándida Gutiérrez y Enid Rodríguez. T.E. de 20 de octubre de 2003, págs. 65-68. El 26 de junio de 2001, el licenciado Llovet García le entregó el video. Lo vio en la oficina de Servicios Técnicos del NIE y sacó dos (2) copias VHS. Una copia era para el NIE y otra para el licenciado Llovet García. El 20 de agosto de 2003, entregó el video a la agente Hernández Morales. T.E., págs 71-73.
Durante el contrainterrogatorio, declaró que ella realizó varias confrontaciones fotográficas y que otros agentes del NEE asistieron en las citaciones. T.E. de 20 de octubre de 2003, págs. 93, 95-97. Su investigación arrojó que no todos lo agentes agredieron y que algunos protegieron a las personas en el incidente. Contrainterrogatorio Ledo. Valle - T.E. de 21 de octubre de 2003, págs. 95-96. Además, surge del contrainterrogatorio de la defensa a la agente Crespo Talayeras lo siguiente:

“Leda. Rivera:

P. ¿Para qué usted hizo un “line-up” a Marta Ivonne en relación a Warner?

R. Para que identificara a los agentes que habían llegado a la fiesta y a los que, alegadamente, habían agredido a varios ciudadanos.

P. Okey. Cuando usted llevó a Marta a la rueda de confrontación, ¿qué usted le dijo?

R. El 28 de junio de 2001, se le realizó una rueda de confrontación personal solamente al agente Em[m]anuel Ojeda Carrión, ya que los demás agentes no fueron al lugar. Se le indicó a la señora Marta Ivonne Vázquez, que iba a tener a cinco personas, de esas cinco personas, ella iba, si podía, identificar alguna persona, si ella conocía a alguna de esas personas.

P. ¿Quéfue lo que usted llevó a Marta allí?

R. Para que identificara, si pudiese identificar, a alguna persona, si se le pareciera, a alguna persona de las que estaban en el lugar de los hechos el 17 (21) de junio.

P. Usted llevó a Marta a un “line-up”, para que identificara a las personas que estuvieron allí.

R. Si hubiese alguno, porque no se le dice a la persona que hay un sospechoso.

T.E. de 21 de octubre de 2003, págs. 167-169.

*1114
La agente Crespo Talayeras indicó que citó a todos los agentes para la rueda de confrontación, pero no todos comparecieron. Por ello, procedió a realizar la rueda de confrontación fotográfica. T.E. de 27 de octubre de 2003, pág. 73. La defensa le preguntó:

P. ¿Tiene usted evidencia de que hayan sido citados?

R. En el expediente.

P. En el expediente. Dígame, si el agente Miguel Rodríguez Benabe fue citado.

R. Sí.

P. Yfue citado personalmente, para comparecer personalmente.

R. Tendría que verificar, tendría que decirle la persona que lo citó. Yo no lo cité personalmente.

T.E., págs. 73-74.

Especificó que Rivera Gómez fue citado por unos compañeros del NIE para la rueda de confrontación. Veamos su testimonio:

P. Usted lo citó.

R. No. Compañeros del Negociado.

P. Okey. Ahora le pregunto, ¿qué compañero del Negociado fue específicamente el que citó a don Luis Rivera Gómez?

R. Tendría que verificar la citación para recordar el nombre del agente.

P. Okey. Entonces, usted tiene consigo la citación que se le hizo a don Luis Gómez.

R. No.

P. ¿No la tiene?

R. No.

P. ¿Quién tiene ese documento?

R. La Fiscalía, Fiscal Rodríguez y Cándida Gutiérrez.

P. Antes de eso. Una pregunta. Usted dijo que la fecha en que se citó a Luis Rivera Gómez, ¿fue qué fecha?

R. 28 de junio del 2001.

P. Okey. ¿ Y no se volvió a citar?

*1115
R. Sí, posterior a esa fecha, se volvieron a citar.

P. Mire, estoy hablando de Luis Rivera Gómez. Le pregunto, si después del 28 de junio, que usted dice que usted tiene conocimiento de que no lo citaron, que lo citaron, perdón, le pregunto, si después del 28, si lo citaron para otra fecha y usted me contestó que sí.

R. ¿Luis Rivera Gómez?

P. Luis Rivera Gómez.

R. No recuerdo, no recuerdo.

P. ¿Pudieron haberlo citado de nuevo?

R. Sí.

P. ¿ Usted no tiene conocimiento si a Luis Rivera Gómez, en efecto, lo hubiesen citado después de sometido los casos para una rueda de confrontación?

R. ¿Personal? ¿ Una rueda de confrontación personal?

P. De lo que sea.

R. Bueno, confrontación personal, no.

P. Bien. Entonces, usted dice que usted citó a Luis Rivera Gómez para el 28 de junio. Perdone. Retiro la pregunta. No que usted citó, que usted tiene conocimiento de que lo citaron para el 28 de junio de 2001.

R. Compañeros del Negociado diligenciaron una citación.

P. ¿Eso a usted, mire, eso le consta a usted de propio conocimiento, de que eso fue así?

R. No, no me consta.

P. Entonces, a usted no le constó de que en efecto a Luis Rivera Gómez lo hubieran citado para el 28 de junio del 2001. ¿Eso es lo que usted dice?

R. Exacto. T.E. de 27 de octubre de 2003, págs. 103-107.

El 29 de octubre de 2003, continuó el contrainterrogatorio de la agente Crespo Talayeras. Se presentó en evidencia la citación expedida a Rivera Gómez, la cual fue diligenciada el 27 de junio de 2001. (Exhibit 11). Según surge del testimonio, la citación no advertía que tenía que comparecer a una rueda detenidos. Tampoco que debía ir acompañado de un abogado. La citación la recibió Miguel Avilés. Veamos el testimonio:

“P. Sí. Pero usted dice que usted revisó, antes de hacer otro “line-up ” que usted hizo, y que usted revisó que esta persona había sido citada efectivamente.

*1116
R. Sí.

P. ¿Esa persona había sido citada para qué?

R. Okey. Se citó para el 28 de junio del 2001, para que asistiera a una rueda de confrontación personal en el Cuartel General.

P. Y esa citación que usted dice que se diligenció, ¿eso es lo que usted dice que se diligenció, la citación?

R. Sí

P. Y la citación que usted dice que se diligenció, estaba dirigida a él, para que él compareciera a una rueda de confrontación.

R. Sí

T.E., págs. 4-5.

P. Mostrándole el Exhibit 11 de la Defensa, le pregunto, enséñeme en esos documentos dónde es que dice que la persona debe de comparecer a una rueda de detenidos.

R. No, no lo dice.

P. No lo dice. Le pregunto, si en ese mismo documento, ¿dónde dice que la persona debe comparecer a una rueda de detenidos y que debe venir acompañado de un abogado?

R. No. No lo dice.

P. ...Yo le pregunto, que si en ese documento dice que Luis Rivera Gómez fue citado, y si esa persona que fue citada, ¿a dónde es que dice opte fue citada?

R. Simplemente, la recibió Miguel Avilés.

P. Miguel Avilés. ¿Dice en algún sitio que Luis Rivera Gómez recibió esa citación?

R. No.

P. ...Entonces, basado en este documento es que usted, entonces, procedió a no hacer la identificación en persona y procedió, en otro día, a hacer la identificación por fotografía. ¿Basado en este documento?

R. Sí.

T.E., págs. 7-9.

Igualmente, la citación expedida a Barahona Gaetán fue diligenciada el 27 de junio de 2001, para que compareciera al Cuartel General el 28 y 29 del mismo mes y año. T.E., págs. 29-30 y 32.
*1117 Declaró, además, que un inspector de la Policía de Puerto Rico fue quien firmó las citaciones. T.E., págs. 24-25. Posteriormente, la defensa le preguntó:

“P. ¿Cuándo fue que a usted le entregaron para usted hacer... cerciorarse, como usted dice, usted se cercioró que habían sido citados estas personas? Eso es lo que usted acaba de decir, ¿verdad que sí?

R. Que vi las citaciones firmadas.

P. Que vio las citaciones. Y eso, le pregunto, ¿cuándo fue que usted vio estas citaciones firmadas, bajo la cual usted tomó la decisión de hacer unos “line-ups” por fotografías?

R. El día antes de realizarse el “line up ”.

P. ¿El día antes de realizarse el “line-up” de?

R. La rueda de confrontación personal. O sea, fue para el 28.

P. Okey. Y entonces, el día... ¿El día antes de reali... de cuando se iba a realizar la confrontación es que usted se cercioró de que habían sido diligenciadas?

R. Sí. ”
T.E., págs. 25-26.
9. Testimonio de la agente Vimarie Hernández Morales:
Vimarie Hernández Morales es agente especial del NIE en la División de Integridad Pública. Declaró que el agente Roberto Ortiz, supervisor de la División de Derechos Civiles del NIE, le asignó la investigación el 22 de junio de 2001. La agente visitó el lugar de los hechos, entrevistó a los querellantes y testigos y realizó ruedas de confrontación personal y por fotografías.
También declaró que el 22 de junio de 2001, el licenciado Llovet García le solicitó al fiscal Héctor Montañez una copia del video. El agente Ignacio Acevedo Cardona y ella copiaron el video completo. La agente Hernández Morales inició la copia y puso la fecha. La señora Torres Pérez también la inició. Luego, el fiscal Montañez les entregó a la señora Vázquez Molina y a la señora Torres Pérez la copia del video y el original. Finalmente, testificó sobre la cadena de custodia del video. T.E. de 29 de octubre de 2003, págs. 41-53.
Durante el contrainterrogatorio, testificó que no podía garantizar que el video que se entregó al NIE fuera el original. Esta no sabía a quién pertenecían las iniciales “R.A.L.L.” que aparecían en el video. Contrainterrogatorio Ledo. Calderón - T.E. de 29 de octubre de 2003, págs. 53-54. Declaró que citó personalmente a algunos testigos del caso. La defensa le preguntó:

“P. En cuanto a los agentes imputados en este caso...

P. ...usted personalmente, ¿diligenció cualquier tipo de citación para cualquier procedimiento de forma personal a cualquiera de los agentes?

R. Ninguna. ”
*1118 10. Testimonio del agente Ignacio Acevedo Cardona:
“Ignacio Acevedo Cardona es agente del NIE. Testificó que el 22 de junio de 2001, tomó fotografías a una cámara de video y a un video que los agentes Vimarie Hernández Morales y Roberto Ortiz le llevaron a su oficina. Vio el video en esa ocasión. El 26 de junio de 2001, la agente Diliana Crespo Talaveras le entregó la evidencia para reproducirla al formato VHS. Indicó, que el licenciado Llovet García estuvo presente en ese momento. Testificó, además, que podía certificar que el video era el original por la calidad y resolución de la película. ” T.E., págs. 79-80.
11. Testimonio de Darling H. Guzmán Espaillat:
“Darling H. Guzmán Espaillat es cuñado de Roberto. Declaró que el día de los hechos su cuñado lo fue a buscar al Me Donald’s de Loíza y él lo siguió hasta el Centro Vacacional. Ambos entraron a la actividad y se sentaron en una mesa. Rivera Martínez salió afuera a fumarse un cigarrillo y él se quedó en la mesa. Al poco rato, vio que Rivera Martínez entró de espaldas al salón y un policía lo agredió con el rotén. En ese momento entraron más policías y lo agredieron. Agregó, que la madre de Rivera Martínez lo protegió mientras “cinco policías volando palos ” los acorralaron en la pared. ” T.E. de 5 de diciembre de 2003, págs. 13-15.
Durante el contrainterrogatorio, declaró que fue al NIE para ver una confrontación por fotografías e identificó a un señor de apellido Rojas. En la rueda de confrontación personal identificó a un señor de apellido Ojeda. T.E. de 5 de diciembre de 2003, págs. 18-26. Además, identificó a los agentes Luis Rivera Rojas y Emmanuel Ojeda Carrión en Sala. T.E., págs. 76-77. Finalmente, testificó que no pudo identificar a Rodríguez Benabe en la rueda de confrontación personal. Continuación Contrainterrogatorio Ledo. Calderón - T.E. de 9 de diciembre de 2003, pág. 12.
12. Testimonio de Luis E. Vázquez Ortiz:
“El señor Luis E. Vázquez Ortiz, quien es el padre de Marta Ivonne, declaró que entre 7:00 y 7:30 p.m. le dijeron que la policía intervenía con su hija. Salió del salón y le preguntó a su hija qué pasaba. Esta le respondió que nada. Le dijo a su hija que entrara al salón para que atendiera a los invitados. Barahona Gaetán se molestó. Lo agredió con el rotén en el estómago y cayó al piso. Después que lo agredieron expresó: “La Policía está del carajo ” y se marchó al apartamento que tenía alquilado en el Centro Vacacional. Este no vio lo que sucedió en el salón. ” T.E. de 9 de diciembre de 2003, págs. 42-45.
En el contrainterrogatorio, identificó en Sala a los seis (6) agentes (Emmanuel Ojeda Carrión, Miguel Rodríguez Benabe, Javier Hernández, Warner Barahona Gaetán y Luis Rivera Gómez). Contrainterrogatorio Directo - T.E. de 9 de diciembre de 2003, págs. 89-93. La defensa le preguntó si Barahona Gaetán estuvo todo el tiempo afuera del local. Éste respondió: “Bueno, hasta la fecha no entró, en el momento que no había pasado ningún incidente. No lo vi después, porque se me perdió entre la gente, después que él me dio, él siguió para allá adentro con todos los demás.” Contrainterrogatorio Leda. Báez - T.E. de 9 de diciembre de 2003, págs. 142-143. Declaró, además, que fue dos veces a la rueda de confrontación fotográfica porque las primeras fotografías que le mostraron estaban borrosas. T.E. de 11 de diciembre de 2003, págs. 4-5.
13. Testimonio de Luis A. Romero Torres:
Luis A. Romero Torres tenía 16 años para la fecha de los hechos. Declaró que estaba afuera del salón cuando llegó la policía. Testificó que intentó entrar al salón para buscar a su madre, pero tres agentes le impidieron el paso. Identificó a los agentes en Sala por su vestimenta. Explicó que un agente le dijo que no *1119 podía pasar. Éste le respondió que su madre estaba adentro y no la podía dejar sola. El agente le dijo: “Ah, pero es que ustedes los muchachos se creen bravos [sicj, ¿ustedes tienen cojones?”. Indicó, que “el de la chaqueta de mahón" (Ojeda Carrión) fue quien le dijo eso. El agente le dio en la espalda con la macana y un segundo golpe en el brazo. Cayó al piso y el agente le dio un puño detrás de la oreja. Al minuto llegó su madre y lo sacó. T.E. de 11 de diciembre de 2003, págs. 41-47.
Durante el contrainterrogatorio, declaró que iba con tres amigos cuando los policías intervinieron con él. Contrainterrogatorio Ledo. Valle - T.E., pág. 64. Había una línea de policías cuando intentó entrar al local e insistió para que lo dejaran pasar. T.E., págs. 87-89. Especificó, que lo agredieron después que montaron a Rivera Martínez en la patrulla. T.E., pág. 110. La defensa le preguntó cuánto tiempo transcurrió entre la agresión y el momento que vio a su madre. Éste respondió que se levantó del piso y vio a su madre que venía. T.E., pág. 118. Finalmente, se le mostró el video en Sala. Ubicó a Ojeda Carrión cerca de la pared. También, identificó a su madre cuando salió del salón. T.E., págs. 128-129. A preguntas del Tribunal, aclaró que el incidente en el salón ocurrió primero y luego lo agredieron a él. Véase, T.E., págs. 137-144.
14. Testimonio de Miriam Martínez Couvertier:
La señora Miriam Martínez Couvertier testificó que los policías la agredieron cuando protegió a su hijo Roberto Rivera Martínez. Testificó, además, que su hijo corrió hacia una puerta y ella intentó evitar que los policías pasaran. La policía la empujó cuando estaba en la puerta. Llegó una mujer policía y no dejó pasar a nadie. La Defensa no contrainterrogó. T.E. de 12 de diciembre de 2003, págs. 5-14.
B. Prueba de la defensa:
1. Testimonio de la agente Damaris Rodríguez Hernández:
La agente Damaris Rodríguez Hernández declaró que el día de los hechos estaba de retén en el cuartel de Loíza. A eso de las 8:00 p.m. recibió una llamada de la administradora del Centro Vacacional UIA, la señora Irma Feliú Miranda. La administradora le indicó que había una pelea y requirió que le enviaran la policía. La agente testificó que llamó a la Unidad Anti-Crimen por el radio para que fueran al Centro Vacacional porque había una pelea en proceso. También llamó al Centro de Mando de Carolina e indicó que había un motín. T.E. de 26 de febrero de 2004, págs. 12-20.
2. Testimonio del agente George Vega Mangual:
El agente George Vega Mangual declaró que el día de los hechos estaba de retén en la División de Operaciones Tácticas de la Comandancia de Carolina. A las 8:00 p.m. escuchó por el radio que del cuartel de Loíza llamaron a la ronda del precinto que se encontraba en el área de Loíza para atender una pelea de grandes proporciones que se desarrollaba en el Centro Vacacional. Escuchó que Rodríguez Benabe llamó por el radio a Barahona Gaetán. Barahona Gaetán le indicó que se mantuviera “stand-by” y avisó que necesitaba un supervisor de rango en el lugar, ya que la situación lo ameritaba. Finalmente, escuchó varias veces a los agentes pedir refuerzos en el lugar porque la pelea era de grandes proporciones. T.E. de 26 de febrero de 2004, págs. 21-41.
3. Testimonio de Irma Feliú Miranda:
La señora Irma Feliú Miranda, quien para la fecha de los hechos era la administradora del Centro Vacacional UIA, declaró que hubo una pelea entre dos mujeres en el salón de actividades. Trató de controlar la situación, pero ella estaba sola y había muchas personas en el lugar. Llamó a la policía y éstos le dijeron que había una emergencia y no podían ir en ese momento. Al rato llegaron seis o siete policías. Ella les preguntó a *1120 los agentes porqué estaban allí. Los agentes le manifestaron que estaban dando apoyo a los policías de Loíza. La señora Gladys Díaz, quien estaba encargada del “catering”, la llevó a la cocina por su seguridad. Permaneció en la cocina hasta que terminó el incidente. T.E. de 26 de febrero de 2004, págs. 51-56 y 98-99.
También, declaró que la señora Vázquez Molina, el señor Vázquez Ortiz y una persona de tez trigueña estaban afuera del local cuando llegó la policía. El señor Vázquez Ortiz estaba molesto y le dijo a los guardias que se fueran “pal carajo". La persona de tez trigueña hizo gestos con sus manos y le dijo a los agentes que iba a tumbarles la cabeza. Los agentes entraron al salón para detenerlo. Ella no vio lo que sucedió en el salón. Finalmente, testificó que afuera había unas veinte o treinta personas que estaban molestas porque ella llamó a la policía. T.E. de 27 de febrero de 2004, págs. 4-44.
4. Testimonio del apelante Miguel Rodríguez Benabe:
Rodríguez Benabe prestó testimonio luego de renunciar al privilegio contra la autoincriminación. Declaró que el día de los hechos trabajaba en la División de Operaciones Tácticas de Carolina. Ese día tomó servicio a las 6:00 p.m. en la Comandancia de Carolina. Se le asignó patrullaje preventivo en el área de Loíza, en compañía de los agentes Luis Rivera Rojas y Javier Hernández. Escuchó por el radio que había una pelea en el Centro Vacacional y se dirigió inmediatamente hacia el lugar. Fueron los primeros en llegar y entraron al local. Un grupo de personas comenzaron a decirles: “Mira, mira, entraron éstos, que indiecitos, los apretaítos, ah, mira estas patitas.” Rodríguez Benabe no les hizo caso y se dirigió a la cocina a buscar a la administradora del local. Entrevistó a la administradora en la cocina y después salió afuera para llamar a Barahona Gaetán desde la patrulla. Indicó que el supervisor de la DOT esa noche era Barahona Gaetán.
Luego, la defensa le preguntó sobre lo que le había manifestado la administradora en la cocina. El Ministerio Público se opuso, por ser prueba de referencia. La defensa argumentó que el testimonio de Rodríguez Benabe era una excepción a la regla de prueba de referencia. Adujo, que las manifestaciones de la administradora eran admisibles como parte del res gestae porque ella temía por su seguridad. Señaló, además, que dicha manifestación probaba la legalidad de la presencia de los agentes y no la veracidad de lo aseverado por la administradora. Instancia sostuvo la objeción. T.E. de 27 de febrero de 2004, págs. 47-94; T.E. de 5 de marzo de 2004, págs. 12-38.
Durante el contrainterrogatorio, declaró que cuando entró al salón no vio a niños jugando, ni personas bailando en la fiesta. Tampoco recordó si había música en ese momento. T.E. de 5 de marzo de 2004, págs. 39 y 42.
A base de la prueba desfilada, instancia declaró culpable a los apelantes. En cada uno de los cargos, impuso una condena de tres (3) años de prisión, el pago de costas y, además, una pena especial de $300. Las penas serían cumplidas consecutivamente entre sí, excepto la de Rodríguez Benabe y Ojeda Carrión, quienes cumplirían sus penas concurrentemente. También se les concedió a los apelantes el beneficio de la suspensión de la sentencia.
Inconforme, los apelantes presentaron sus respectivos escritos de apelación en los que plantean varios errores cometidos por el Tribunal de Primera Instancia.
Rivera Gómez señaló la comisión de los siguientes errores:

“PRIMER ERROR

Erró el Tribunal de Primera Instancia al admitir prueba inadmisible debidamente objetada y por otro lado, no permitir a la defensa presentar prueba admisible.

*1121
SEGUNDO ERROR

Erró el Tribunal de Primera Instancia al resolver que la identificación del acusado era válida, a pesar de que la misma no cumplió con lo establecido en las Reglas de Procedimiento Criminal ni con las garantías establecidas por la jurisprudencia, lo que impidió que el acusado tuviera un juicio justo e imparcial.

TERCER ERROR

Erró el Tribunal de Primera Instancia al resolver que el Ministerio Público había probado todos los elementos del Artículo 4.05 de la Ley de Armas más allá de duda razonable.

CUARTO ERROR

Erró el Tribunal de Primera Instancia al resolver que el Ministerio Público había probado todos los elementos del Artículo 95 (H) del Código Penal más allá de duda razonable.

QUINTO ERROR

Erró el Tribunal de .Primera Instancia al darle credibilidad a los testimonios contradictorios de los principales testigos de cargo.

SEXTO ERROR

Erró el Tribunal de Primera Instancia al resolver que el acusado era culpable de los delitos imputados sin que el Ministerio Público probara el caso más allá de duda razonable. ”
Por su parte, Rodríguez Benabe y Ojeda Carrión le~imputaron a instancia haber incurrido en los siguientes errores:

“PRIMER ERROR

Incidió el Tribunal de Instancia al encontrar culpables a los apelantes por unos hechos que no constituyen delito, ya que deforma incontrovertida la prueba estableció que se encontraban en el ejercicio legítimo de sus funciones como agentes del orden público, atendiendo e investigando una querella que fuera cursada a la Policía de Puerto Rico y en el curso de tal investigación intentaron arrestar a Roberto Rivera Martínez por haber cometido un delito en su presencia.

SEGUNDO ERROR

Cometió error manifiesto el Tribunal de Primera Instancia al emitir veredictos condenatorios, a pesar de que la prueba de cargo fue insuficiente en derecho y, por ende, no estableció los elementos constitutivos de los delitos imputados. Surge de la prueba, deforma no controvertida, que al momento de los hechos, los apelantes estaban intentando realizar un arresto legal y válido y emplearon un instrumento de trabajo (rotén) conforme a las directrices del Superintendente de la Policía al haber Roberto Rivera Martínez resistido el arresto.

TERCER ERROR

La convicción de los apelantes está fundada en: una investigación viciada, deficiente, parcializada y plagada de irregularidades; en el testimonio contradictorio de las presuntas víctimas y testigos de cargo que no debió merecer credibilidad alguna al juzgador de hechos; y en una identificación extrajudicial inválida y 
*1122
contraria a derecho, ya que la agente del Negociado de Investigaciones Especiales instruyó a las personas que fueron conducidas para realizar la identificación que indicaran si en la rueda de confrontación observaban a alguna persona que hubiera estado en los incidentes del 17 de junio de 2001. Además, con anterioridad a la rueda de confrontación, por la naturaleza de sus funciones y debido a que se sometieron cargos contra Roberto Rivera Martínez por los delitos de agresión, empleo de violencia contra la autoridad pública e infracciones al Articulo 401 de la Ley de Sustancias Controladas, Rivera Martínez estuvo en contacto con los apelantes toda la noche mientras estuvo detenido, luego cuando se le fueron a someter los cargos y posteriormente durante la vista preliminar. Por tales razones, como resultado de una confrontación previa a la identificación, el debido proceso de ley impedía la admisibilidad de la identificación judicial.

CUARTO ERROR

Erró el Tribunal de Instancia al no realizar un análisis integral de la prueba desfilada y descartar injustificadamente la prueba de defensa y, en particular, el testimonio de un testigo sin interés en el caso que acreditó que la intervención de los apelantes se realizó en medio de un arresto legal y, como consecuencia de que Roberto Rivera Martínez hubiera resistido el arresto, emplearon sus roténes para someterlo a la obediencia y efectuar el arresto, según directrices de la Policía de Puerto Rico.

QUINTO ERROR

La prueba de cargo fue altamente contradictoria para sostener la convicción del apelante Emmanuel Ojeda Carrión en l[a]s acusaciones por los hechos relacionados con Luis Arnaldo Romero Torres. Al atender la solicitud de reconsideración de la defensa, el Magistrado sentenciador reconoció que existía la posibilidad de que los hechos no hubieran ocurrido según relatados por el presunto perjudicado. De ahí, que el Magistrado sentenciador debió haber decretado la absolución del apelante, ya que reconoció que existía duda razonable en cuanto a su culpabilidad.

SEXTO ERROR

, Erró el Tribunal de Primera Instancia al encontrar culpable a los apelantes a pesar de que el Ministerio Público no estableció este hecho más allá de duda razonable e incumplió su obligación de rebatir la presunción de inocencia.

SÉPTIMO ERROR

Erró el foro de instancia al denegar erróneamente la admisibilidad de evidencia y, en particular, el testimonio del apelante Rodríguez Benabe sobre las gestiones y hallazgos de la investigación que practicaba como agente del orden público en relación a los hechos por los que posteriormente fue procesado.

OCTAVO ERROR

La acumulación de errores cometidos por el foro de instancia durante el proceso judicial de los apelantes vulneró el derechojsic] al debido proceso de ley y, consecuentemente a un juicio justo e imparcial.

Finalmente, Barahona Gaetán señaló los siguientes errores:

PRIMER ERROR

Erró el Tribunal de Primera Instancia al no conceder al apelante el beneficio de la duda razonable, ante la totalidad de la prueba desfilada por el Ministerio Público.

*1123
SEGUNDO ERROR

Erró el Tribunal de Primera Instancia al encontrar culpable al apelante por hechos que, aun de haber sido ciertos, no constituyen delito y al denegar la solicitud de absolución perentoria oportunamente presentada y fundamentada por la defensa del apelante.

TERCER ERROR

Erró el Tribunal de Primera Instancia al no permitir la declaración del testigo de defensa Miguel Rodríguez Benabe, sobre hechos que le constaban a éste de propio y personal conocimiento y que eran pertinentes a la inocencia del apelante, así como de otros testigos anunciados por la defensa del apelante.

CUARTO ERROR

Erró el Tribunal de Primera Instancia al dar crédito a los testimonios inverosímiles, acomodaticios y contradictorios entre sí de los principales testigos de cargo.

QUINTO ERROR

Erró el Tribunal de Primera Instancia al no descartar por completo los testimonios de los agentes investigadores e interventores, de los cuales surgió claramente que la investigación realizada estuvo plagada de irregularidades, omisiones, parcialidad, identificación viciada e ilegal del apelante, violación de derechos del apelante e incluso prueba alegadamente adulterada, entre otras.

SEXTO ERROR

Erró el Tribunal de Primera Instancia al negarle al apelante un juicio justo e imparcial y conforme al debido proceso de ley.

SÉPTIMO ERROR

Erró el Tribunal de Primera Instancia al disponer en corte abierta al momento de dictar sentencia que no impondría condiciones especiales al apelante para el cumplimiento de su sentencia bajo el régimen de sentencia suspendida y posteriormente, sin razón alguna que así lo justificase,, notificar una sentencia con las condiciones especiales que expresamente había rechazado en corte abierta al momento de dictar sentencia.

Expuestos lo errores como fueron alegados por los apelantes y con el beneficio de la comparecencia de las partes, procedemos disponer de los recursos.
III
Por estar íntimamente relacionados entre si, los errores señalados, los discutiremos en conjunto. Los errores se circunscriben, en esencia, a: 1) la validez de las identificaciones de los apelantes; 2) la prueba desfilada no estableció su culpabilidad más allá de duda razonable; 3) la credibilidad de los testigos; y 4) la admisión y exclusión indebida de cierta evidencia.
A. La validez de la identificación de los apelantes
En sus respectivos recursos, los apelantes objetan la validez y admisión de sus respectivas identificaciones. Veamos.
*1124 La identificación del acusado es una etapa esencial en el procedimiento criminal, ya que no puede subsistir una convicción sin prueba que señale al imputado como la persona que cometió los hechos delictivos. No puede haber un juicio justo e imparcial si no se garantiza debidamente la forma de identificar a la persona que se acusa de la comisión de un delito. Pueblo v. Gómez Incera, 97 D.P.R. 249, 252 (1969). La Regla 252 de Procedimiento Criminal dispone los procedimientos para la identificación mediante rueda de detenidos y fotografías. La mencionada regla persigue evitar que los funcionarios del Estado a cargo de un procedimiento de identificación interfieran indebidamente con los testigos, sugiriéndole la persona que deben identificar. Pueblo v. Mejias, Op. de 18 de julio de 2003, 2003 J.T.S. 126, a la pág. 1335.
La garantía de proveer un juicio justo e imparcial y la indelegable responsabilidad de la administración de la justicia, nos lleva a evaluar que el proceso de identificación de los acusados sea uno libre de errores y con ello salvaguardarles su debido proceso de ley.
Como parte de la fase investigativa de un caso criminal, el Estado puede valerse de varias formas para identificar los sospechosos de la comisión del delito investigado. Entre éstas, la rueda de detenidos, fotografías y huellas dactilares. Pueblo v. Ramos y Álvarez, 122 D.P.R. 287, 310 (1988).
La Regla 252.1 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 252.1 (Regla 252.1), establece las reglas a seguirse al efectuarse una rueda de detenidos. Su inciso (d> dispone que. en la composición de la rueda deben participar por lo menos cuatro (4) personas en adición al sospechoso, quienes tendrán apariencia física similar a la de éste, respecto a sexo, color, raza y, hasta donde sea posible, similar estatura, e'dad, peso y vestimenta. Én la rueda de detenidos no debe haber más de un sospechoso, ni se permitirán indicios visibles de forma ostensible que señalen a determinada persona como el sospechoso.
El inciso (e) de la Regla 252.1 establece el procedimiento a seguirse en el caso de la rueda de detenidos. La misma dispone que:

“(1) No se permitirá que los testigos vean al sospechoso ni a los demás integrantes de la rueda de detenidos con anterioridad a la celebración de la rueda de detenidos.

(2) No se le informará a los testigos antes de la celebración de la rueda que se tiene detenido a un sospechoso.

(3) No se le dará ninguna información sobre los de la rueda.

(4) Si dos o más testigos fueran a participar como identificantes, no se permitirá que se comuniquen entre sí antes o durante la identificación y cada uno hará la identificación por separado.

(5) El testigo observará la rueda y con la menor intervención de los agentes o-funcionarios del orden público, identificará de manera positiva al autor de los hechos delictivos si éste se encuentra en la rueda.

(6) Si el sospechoso es requerido para que diga alguna frase, haga algún movimiento o vista algún atavío, se requerirá de los demás integrantes expresión, actuación o vestimenta deforma parecida.

(7) En ningún caso se le sugerirá al testigo la persona que debe seleccionar, ya sea expresamente o de cualquier otra forma. ”

Por su parte, el inciso (f) de la Regla 252.1 requiere que el encargado de la rueda levante un acta breve que formará parte del expediente policiaco o fiscal correspondiente. El acta incluirá los integrantes de la rueda, los nombres de las otras personas presentes y un resumen de los procedimientos observados.
*1125 Otro medio de identificación de un sospechoso es el uso de las fotografías. El inciso (a) de la Regla 252.2 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 252.2 (a), dispone que los agentes y funcionarios del orden público podrán hacer uso de fotografías para identificar el posible autor de un acto delictivo únicamente en las siguientes circunstancias:

“(1) Cuando por razones fuera del control de los agentes o funcionarios del orden público, no fuere posible o necesario realizar una rueda de detenidos.

(2) Cuando no exista sospechoso del acto delictivo.

(3) Cuando existiendo un sospechoso, éste se negare a participar en la rueda, o su actuación o ausencia impidiese que la misma se efectué adecuadamente. ”

El inciso (b) de la Regla 252.2 establece las siguientes reglas para la utilización de fotografías como medio de identificación:

“(I) Se le mostraran al testigo no menos de nueve (9) fotografías incluyendo la del sospechoso y éstas presentarán, en adición al sospechoso, personas de rasgos similares a éste.

(2) Si dos o más testigos fueran a hacer la identificación fotográfica, cada uno hará la identificación por separado.

(3) En ningún caso se le sugerirá al testigo la persona que debe seleccionar, mediante la forma de llevar a cabo el procedimiento, por marcas en las fotografías, o cualquier otro medio.

(4) Celebrada la identificación fotográfica, si el testigo identificara el autor de los hechos delictivos, se procederá a levantar un acta que resuma brevemente el~procedimiento seguido y se identificarán las fotografías utilizadas de manera que posteriormente pueda establecerse cuáles fueron las fotografías presentadas al testigo. ”

Ahora bien, cuando la identificación del acusado ha sido obtenida mediante un procedimiento sugestivo, nuestro Tribunal Supremo ha resuelto que ello constituye una violación a la garantía constitucional al debido proceso de ley. Ramos y Álvarez, 122 D.P.R., a la pág,. 311; Gómez Incera, 97 D.P.R., a las págs. 251-252. Véase, además, Stovall v. Denno, 388 U.S. 293 (1967); Gilbert v. California, 388 U.S. 263 (1967); Únited States v. Wade, 388 U.S. 218 (1967). Este tipo de evidencia resulta excluible del juicio, pudiendo solicitarse su supresión. United States v. Wade, 388 U.S., a las págs. 239-241; Gilbert v. California, 388 U.S., a la pág. 272; Pueblo v. Rey Marrero, 109 D.P.R. 739, 750 (1980).
La confiabilidad de la identificación de un-acusado y si ésta constituye o no una violación al debido proceso de ley depende de la totalidad de las circunstancias presentes en la identificación. Pueblo v. Rodríguez Maysonet, 119 D.P.R. 302, 309 (1987). En estos casos, corresponde más bien al jurado o al juez constituido en tribunal de derecho adjudicar la credibilidad de los testigos, cuando se plantea que la prueba sobre identificación podría resultar no confiable. Pueblo v. Torres Rivera, 137 D.P.R. 630, 638 (1994); Pueblo v. Rodríguez Román, 128 D.P.R. 121, 127-129 (1991). La conclusión que el juzgador de los hechos determine sobre este punto tiene todo el respeto y validez que ordinariamente se extiende a las determinaciones de hechos. Esto es así, ya que el juzgador de los hechos está en mejor posición para adjudicar la credibilidad, por lo que sus determinaciones sólo se suplantarán si no están sostenidas por la prueba presentada. Rodríguez Román, 128 D. P.R., a la pág. 128; Pueblo v. Peterson Pietersz, 107 D.P.R. 172, 183 (1987).
A estos efectos, se ha expresado que la admisión de prueba de identificación, aunque contenga elementos de *1126 sugestividad, no viola el debido proceso de ley si están presentes suficientes elementos de confiabilidad en consideración a la totalidad de las circunstancias, a la luz de factores tales como: (1) la oportunidad que tuvo el testigo de observar al acusado en el momento en que ocurre el acto delictivo; (2) el grado de atención del testigo; (3) la corrección de la descripción; (4) el nivel de certeza en la identificación; y (5) el tiempo transcurrido entre el crimen y la confrontación. Torres Rivera, 137 D.P.R., a la pág. 637; Pueblo v. Mattel Torres, 121 D.P.R. 600, 608 (1988); Rodríguez Maysonet, 119 D.P.R., a las págs. 309-310; Peterson Pietersz, 107 D.P.R., a la pág. 183.
Sabido es que ninguno de estos criterios por sí sólo es determinante. Su utilidad es manifiesta únicamente cuando se analizan en conjunto. Pueblo v. Calderón Orta, 110 D.P.R. 835, 844 (1981). A fin de cuentas, lo crucial no es el método que se utilice para obtener la identificación, sino que ésta sea libre, espontánea y confiable. Ramos y Álvarez, 122 D.P.R., a la pág. 312; Peterson Pietersz, 107 D.P.R., a las págs. 183-184.
En sus alegatos, los apelantes plantean que las identificaciones no se realizaron conforme a derecho y que el proceso fue sugestivo durante la fase investigativa. Aducen que contrario a lo dispuesto por la Regla 252 de Procedimiento Criminal, la agente Crespo Talaveras instruyó a los testigos que iban a realizar la identificación en la rueda de confrontación que indicaran quiénes eran los agentes que estaban presentes en el lugar de los hechos el 17 de junio de 2001.
A la luz de las circunstancias particulares del presente caso, entendemos que es poco probable que la identificación producida durante la rueda de detenidos hubiera conducido a una identificación errónea de Rodríguez Benabe y Ojeda Carrión. Los hechos ocurrieron en el lugar donde estaban físicamente los testigos, éstos tuvieron la oportunidad de observarlos en el momento que cometieron las agresiones y las ruedas de detenidos se realizaron el 28 de junio y 6 de julio de 2001, dos o tres semanas después de ocurridos los hechos. Además, las expresiones de la agente Crespo Talaveras durante la fase investigativa,. no menoscabó la confiabilidad de la identificación de Rodríguez Benabe y Ojeda Carrión. En fin, la identificación de éstos realizada en el presente caso, a nuestro juicio, contiene las garantías de confiabilidad que consistentemente han sido reiteradas como suficientes por nuestro Tribunal Supremo, lo que hace de la identificación, en esta etapa, una confiable.
No podemos perder de vista que el juzgador de instancia pudo apreciar el comportamiento de los testigos y la forma en que declararon, así como la naturaleza o carácter de su testimonio, previo a otorgarle la credibilidad queen efecto le otorgó. Regla 44 (B) de Evidencia, 32 L.P.R.A. Ap. IV, R. 44 (B). Por otro lado, los apelantes no han demostrado que el Tribunal de Primera Instancia hubiese actuado movido por pasión, prejuicio o parcialidad. Tampoco han demostrado que estemos ante un error manifiesto que nos obligue a concluir que la apreciación del juzgador no resulta razonablé. Sabemos que en ausencia de los factores señalados, la misma merece gran deferencia y no debe alterarse a nivel apelativo a menos que no encuentre apoyo en la prueba presentada o no represente el balance más racional de la totalidad de la evidencia que tuvo ante sí el juzgador. Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598-599 (1995); Pueblo v. Cabán Torres, 117 D.P.R. 645, 648 (1986); Pueblo v. Ríos Álvarez, 112 D.P.R. 92, 105 (1982).
Por su parte, Barahona Gaetán y Rivera Gómez aducen que la agente Crespo Talaveras sometió a los testigos a una confrontación fotográfica, toda vez que supuestamente ellos no estuvieron disponibles para una rueda de detenidos.
En atención al proceso de identificación de un acusado, nuestro Tribunal Supremo ha establecido que cuando la víctima o testigo de la comisión de un delito no conozca personalmente al sospechoso, el procedimiento más aconsejable para la identificación es llevar a cabo una rueda de detenidos". Mejias Ortiz, 2003 J.T.S. 126, a la pág. 1,335; Pueblo v. Robledo, 127 D.P.R. 964, 968 (1991). Sin embargo, el hecho de que no se siga este procedimiento, no tiene el efecto de viciar automáticamente una identificación o hacerla *1127 inadmisible. Mejias Ortiz, 2003 J.T.S. 126, a la pág. 1,335; Robledo, 127 D.P.R., a la pág. 968; Pueblo v. Ortiz Pérez, 123 D.P.R. 216, 223 (1989). Ello es así, por cuanto la norma vigente en nuestra jurisdicción, respecto a esta materia, lo es que la validez, confiabilidad y admisibilidad de una identificación de un sospechoso o acusado debe resolverse al amparo de los hechos y circunstancias particulares del caso; esto es, a base del “criterio de la totalidad de las circunstancias”. Robledo, 127 D.P.R., a la pág. 968. Así pues, aunque se favorece la utilización estricta de los mecanismos de identificación provistos en la Regla 252, su omisión no derrota innecesariamente el proceso.
Nuestro más Alto Foro ha resuelto que cuando el testigo conoce previamente al acusado o lo ha identificado espontáneamente, realmente no hay problema de identificación que justifique la exclusión de dicha prueba. Mattei Torres, 121 D.P.R., a la pág. 608; Rodríguez Maysonet, 119 D.P.R., a la pág. 313; García Reyes, 113 D. P.R., a las págs. 847-848.
Como hemos mencionado, la norma vigente en torno con la confiabilidad y admisibilidad de una identificación de un sospechoso o acusado depende de la totalidad de las circunstancias particulares de cada caso. El análisis de la confiabilidad de la identificación debe hacerse a la luz de los cinco (5) factores anteriormente mencionados, es decir, (1) la oportunidad que tuvo el testigo de observar al acusado en el momento en que ocurre el acto delictivo; (2) el grado de atención del testigo; (3) la corrección de la descripción; (4) el nivel de certeza en la identificación; y (5) el tiempo transcurrido entre el crimen y la confrontación. Este estándar se utiliza para evaluar la validez de la identificación no importa el procedimiento empleado. Ortiz Pérez, 123 D.P.R., a la pág. 223.
Ahora bien, Barahona Gaetán y Rivera Gómez fueron citados para comparecer al Cuartel General el 28 y 29 de junio de 2001. Resulta apropiado señalar que con anterioridad a los hechos, los testigos no los conocían, a excepción de la señora Vázquez Molina, que manifestó durante el juicio que conocía a Barahona Gaetán por haberle sometido unos casos criminales a su esposo. Así también, debemos llamar la atención sobre el hecho de que aun sin una descripción precisa de los posibles sospechosos, los apelantes fueron citados por el N1E para comparecer para una rueda de detenidos. La citación fue diligenciada el 27 de junio de 2001; y como hemos informado, la comparecencia- de los agentes iba a tener lugar él 28 y 29 de junio de 2001, la citación no advertía que sus comparecencias eran para una rueda de detenidos. Del examen a los autos y, específicamente, a la mencionada citación, se desprende que la misma “era' para una investigación-oficial y confidencial”; nada advertía sobre un requerimiento para rueda de detenidos. Exhibit 11, 12 y 13 de la defensa; T.E. 29 de octubre de 2003, págs. 7-8. A preguntas de la Defensa, la agente Crespo Talaveras declaró que unos compañeros suyos del NIE citaron a Barahona Gaetán y Rivera Gómez para la rueda de detenidos, pero no comparecieron. Así que procedió en cuanto a éstos a realizar la rueda de confrontación fotográfica a los testigos. Obsérvese que las citaciones fueron para comparecer el 28 y 29 de junio; no obstante, ante la alegada primera incomparecencia de Barahona Gaetán y Rivera Gómez, es decir, el 28 de junio, la agente Crespo Talavera realizó la rueda de confrontación fotográfica, sin considerar razones para su incomparecencia y que aún quedaba disponible el 29 de junio para acudir a la citación. Declaró, además, que Miguel Avilés, inspector de la Policía de Puerto Rico, fue quien recibió las citaciones. No obstante, Avilés no testificó en el juicio.
En la situación de autos, el testimonio de la agente Crespo Talaveras sobre la disponibilidad de Barahona Gaetán y Rivera Gómez para una rueda de detenidos fue sumamente vago. No está claro si se hicieron gestiones suficientes encaminadas a asegurar la comparecencia de los citados a la rueda de confrontación, es decir, de Barahona Gaetán y Rivera Gómez, o que el empleo de fotografías fuese del todo indispensable. Según se desprende del testimonio de la agente Crespo Talavera, adujo no tener conocimiento de que efectivamente Barahona Gaetán y Rivera Gómez fuesen citados. T.E. de 27 de octubre de 2003, págs. 52-53 y 103-107.
Además, la identificación que de Barahona Gaetán y Rivera Gómez hiciera Rivera Martínez, no cumple con las garantías de confiabilidad para adjudicar credibilidad a la identificación. Surge de su testimonio que la razón *1128 por la cual identificó a éstos como sus agresores fue porque entraron detrás de Rodríguez Benabe y andaban juntos. Véase, T.E. de 1ro de octubre de 2003, págs. 265-268; Contrainterrogatorio T.E. de 2 de octubre de 2003, págs. 4-5; Contrainterrogatorio T.E. de 3 de octubre de 2003, págs. 63 y 219; T.E. de 6 de octubre de 2003, pág. 61. Sin embargo, Rivera Martínez declaró que protegió su rostro y no tuvo la oportunidad de observar a Barahona Gaetán y Rivera Gómez cuando alegadamente lo agredieron. T.E. de 6 de octubre de 2003, págs. 61-62.
Por otra parte, la señora Vázquez Molina no identificó a Rivera Gómez como agresor de Rivera Martínez, y a Barahona Gaetán, lo ubicó a la entrada del salón de actividades cuando ella entró. Contrainterrogatorio Ledo. Valle - T.E. de 15 de octubre de 2003, págs. 180-181. Más aún, el señor Vázquez Ortiz identificó a Barahona Gaetán y a Rivera Gómez en la rueda de confrontación fotográfica. Cont. Directo - T.E., págs. 84-85 y 89-93. No concebimos cómo puede ser posible que a pesar de ser el único testigo que identificó a Rivera Gómez en Sala, no obstante, haya testificado que no vio lo que sucedió dentro del salón, porque se marchó al apartamento que tenía en el Centro Vacacional. Véase, T.E. de 9 de diciembre de 2003, págs. 42-45. Es menester añadir que del Muestrario de Confrontación Fotográfica admitido en evidencia y utilizado como medio de identificación de Barahona Gaetán y Rivera Gómez, y las fotos tomadas a éstos contemporáneas a los hechos, las que hemos examinado, a nuestro juicio, cualquier persona que no los conociera no pudiera decir que se trata de las mismas personas. Exhibit 5, 6, 7, 13, 20 y 21 del Ministerio Público. Tomando en consideración, entre otros, las irregularidades en torno al diligenciamiento de la citación a Barahona Gaetán y Rivera Gdmez para comparecer a la rueda de confrontación fotográfica; al hecho de que la referida rueda se llevó a cabo aun cuando el Ministerio Público no pudo probar que éstos hubiesen sido adecuadamente notificados; que el NIE optara ante la primera incomparecencia realizar una rueda de confrontación fotográfica con fotos que no se asemejan a Barahona Gaetán y Rivera Gómez, unido a las posturas de los testigos ubicando a éstos en lugares distantes a los presuntos perjudicados y observado con detenimiento la cinta videomagnetofónica admitida en evidencia, albergamos serias dudas en cuanto a la identificación y responsabilidad de Barahona Gaetán y Rivera Gómez por los delitos que le fueron imputados.
En fin, la prueba no sostiene la determinación de instancia, al validar la identificación de Rivera Gómez y Barahona Gaetán, ya que el procedimiento para lograr su identificación estuvo plagado de errores. La posterior identificación de Rivera Gómez y Barahona Gaetán en Sala, contrario a lo que sostiene el Procurador, no puede convalidar .una investigación y un'procedimiento deficiente, razón por la cual este error en. cuanto a éstos fue cometido.
B. La prueba desfilada no estableció su culpabilidad más allá de duda razonable.
Los apelantes plantean que instancia incidió al emitir un fallo de cülpabilidad a pesar de que la prueba resultaba insuficiente para establecer los elementos del delito y para probar su culpabilidad más allá de duda razonable. Veamos.
La Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico consagra la garantía a todo acusado de un delito de que se le presuma inocente, por lo que debe establecerse su culpabilidad más allá de duda razonable. Pueblo v. Irizarry, 156 D.P.R. 780, 786 (2002); Pueblo v. González Román, 138 D. P.R. 691, 707 (1995); Pueblo v. Rosaly Soto, 128 D.P.R. 729, 739 (1991). Véase, además, Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110.
El Estado tiene la obligación de demostrar la culpabilidad del acusado más allá de duda razonable mediante la presentación, en juicio público, de evidencia suficiente en derecho. La prueba debe versar sobre todos los elementos del delito imputado y su conexión con el acusado. Pueblo v. Calderón Álvarez, 140 D.P.R. 627, 643 (1996); González Román, 138 D.P.R., a la pág. 707; Pueblo en interés del menor F.S.C., 128 D.P.R. 931 941 (1991); Rosaly Soto, 128 D.P.R., a la pág. 739.
*1129 Claro está, duda razonable “no significa que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. Sólo se exige que la prueba establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón.” Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598 (1995). Véase, además, Irizarry, 156 D.P.R., a la pág. 787; Pueblo v. Pagan Ortiz, 130 D.P.R. 470, 480 (1992); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 760-761 (1985).
La prueba que presente el Ministerio Público debe ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación. Pueblo v. Rodríguez Santana, 146 D.P.R. 860, 888 (1998); Pueblo v. Colón Castillo, 140 D.P.R. 564, 582 (1996). La insatisfacción con la prueba es lo que se conoce como duda razonable. Pueblo v. De León Martínez, 132 D.P.R. 746, 765 (1993); Rodríguez Román, 128 D.P.R., a la pág. 131; Pueblo v. Cruz Granados, 116 D.P.R. 3, 26 (1984).
La apreciación hecha por el juzgador de los hechos sobre la culpabilidad de todo acusado es una cuestión mixta de hecho y de derecho. Pueblo en Interés Menor F.S.C., 128 D.P.R., a la pág. 942. Por tal razón, la determinación de culpabilidad más allá de duda razonable puede ser revisada en apelación como cuestión de derecho. Pueblo v. Rivera, Lugo y Almodóvar, 121 D.P.R. 454, 472 (1988); Pueblo v. Cabán Torres, 117 D.P.R. 645, 653 (1986).
En el caso que nos ocupa, los apelantes fueron hallados culpables de los delitos de agresión agravada y portación y uso de armas blancas.
El Artículo 94 del Código Penal de 1974 establece que “toda persona que empleare fuerza o violencia contra otra para causarle daño” es culpable del delito de agresión simple. El delito es punible mediante pena de restitución o multa que no exceda de $500.00. 33 L.P.R.A. § 4031.
Los elementos de este delito son el empleo de fuerza o violencia contra una persona y que ello se haga para causarse daño. Asimismo, debe establecerse la relación causal entre el empleo de fuerza o violencia y el daño que se le cause a la persona. Dora Nevares Muñiz, Código Penal de Puerto Rico, Instituto para el Desarrollo del Derecho, 2001, a las págs. 170-171; Pueblo v. Rivera Ortiz, 150 D.P.R. 457, 467-468 (2000); Pueblo v. Rivera Morales, 133 D.P.R. 444, 450 (1993).
Por su parte, el Artículo 95 del referido Código Penal establece que la agresión se considera agravada, entre otros casos, “cuando se cometiere por un funcionario público so color de autoridad y sin causa legítima. ” 33 L.P.R.A. § 4032 (h). El delito apareja pena de reclusión por un término fijo de tres años o multa que no sea menor de $1,000.00 ni mayor de $5,000.00 o ambas penas a discreción del Tribunal. 33 L.P.R.A. § 4032.
Según expuesto, el. funcionario público que agrediere a un ciudadano tiene que estar actuando so color de autoridad y sin causa legítima. “Este es el caso del policía uniformado que, invocando la autoridad que le da su cargo, sin causa legítima agrede a un ciudadano. ” Nevares Muñiz, supra, a la pág. 177. Véase, Pueblo v. Pedrosa, 63 D.P.R. 228, 228-229 (1944); Pueblo v. Marcano, 61 D.P.R. 143, 144-145 (1945).
Cuando la persona no actúa so color de autoridad, pero es un funcionario público que ha acometido o golpeado a otra persona causándole daño sin causa legítima, el delito cometido es el de agresión simple. Nevares Muñiz, supra, a la pág. 177; Pueblo v. Malavé, 64 D.P.R. 659, 660-661 (1945).
Una persona que actúa so color de autoridad es aquélla que, alegando tener autoridad para ello, o actuando como si la tuviera, abusa de sus funciones. El fin del delito no es otro que proteger a los ciudadanos contra aquellos funcionarios públicos que hacen mal uso de su autoridad. Nevares Muñiz, supra, a la pág. 177; Pueblo v. Girón, 25 D.P.R. 36, 43 (1917).
*1130 De otra parte, el Artículo 4.05 de la Ley de Armas, dispone que:

“Toda persona que sin motivo justificado usare contra otra persona, o la sacare, mostrare o usare en la comisión de un delito o su tentativa, manoplas, blackjacks, cachiporras, estrellas de ninja, cuchillo, puñal, daga, espada, honda, bastón de estoque, arpón, faca, estilete, punzón, o cualquier instrumento que se considere como un arma blanca, incluyendo las hojas de navaja de afeitar de seguridad, garrotes y agujas hipodérmicas, o jeringuillas con agujas o instrumentos similares, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de tres (3) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de seis (6) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de seis (6) meses y un día.

Queda excluida de la aplicación de esta sección, toda persona que posea, porte o conduzca cualquiera de las armas aquí dispuestas en ocasión de su uso como instrumentos propios de un arte, deporte profesión, ocupación, oficio o por condición de salud, incapacidad o indefensión. ” 25 L.P.R.A. § 458 (d).
La propia Ley de Armas define lo que se considera un arma blanca. Arma blanca significa “un objeto punzante, cortante o contundente que puede ser utilizado como un instrumento de agresión, capaz de infligir grave daño corporal.” Artículo 1.02 (d) de la Ley de Armas, supra, § 455 (d).
No obstante, al apreciar la evidencia presentada ante el juzgador de los hechos, los tribunales apelativos deben reconocer la inigualable posición én que está el Tribunal de Primera Instancia. Por ello y con el fin de mantener un adecuado balance al evaluar el veredicto recaído, en la medida en que los jueces de primera instancia y los jurados están en mejor posición de apreciar y aquilatar la prueba presentada, su apreciación merecerá gran deferencia y los tribunales apelativos no intervendrán con la misma en ausencia de pasión, prejuicio, parcialidad o error manifiesto. Irizarry, 156 D.P.R., a las págs. 788-789; Rodríguez Santana, 146 D.P.R., a la pág. 234; Pueblo v. Dávila Delgado, 143 D.P.R. 157, 173 (1997); Pueblo v. Chévere Heredia, 139 D.P. R. 1, 16 (1995); Pueblo v. Torres Rivera, 137 D.P.R. 630, 640-641 (1994); Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 62-63 (1991). Sólo ante la presencia de estos elementos, o cuando la apreciación de la prueba no •concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble, se habrá de intervenir con la apreciación efectuada. Irizarry, 156 D.P.R., a la pág. 789.
Los apelantes sostienen que los ánimos en el lugar de los hechos y la resistencia de Rivera Martínez al ser arrestado, justificaba el uso de la fuerza. Rivera Martínez declaró que los policías lo agredieron con los rótenes, mientras intentaba proteger a su madre de los golpes. También señaló que Rodríguez Benabe fue el primero que lo agredió y que Ojeda Carrión lo agredió mientras él estaba en el área de la pared con su madre. Por su parte, la señora Vázquez' Molina declaró que Rodríguez Benabe y otros agentes entraron al interior del local y agredieron a Rivera Martínez. A preguntas de la Defensa, declaró que un policía alto, grande, tosquito y blanquito, que resultó ser Rodríguez Benabe, le dio con el rotén. Indicó, además, que Ojeda Carrión, a quien describió como calvo y chiquito, participó de la agresión cuando Rivera Martínez estaba con su madre en el centro del salón.
No obstante, haber determinado que Rivera Gómez y Barahona Gaetán no fueron identificados correctamente conforme a derecho, a éstos los testigos no los sitúan propinando golpes, e incluso en la cinta videomagnetofónica no aparecen golpeando a los perjudicados. Por el contrario, la señora Vázquez Molina durante su testimonio ubicó a Barahona Gaetán en el lado derecho del centro, alegadamente rociando gas pimienta. Contrainterrogatorio Ledo. Valle - T.E. de 15 de octubre de 2003, págs. 180-181. Además, Rivera Martínez admite que al momento de la golpiza, Barahona Gaetán no se encontraba. Contrainterrogatorio T.E. de 1ro de octubre de 2003, pág. 288; Contrainterrogatorio T.E. de 3 de octubre de 2003, págs. 66-67. Véase, además, Contrainterrogatorio sobre el video - T.E. de 17 de diciembre de 2003, págs. 51-53 y 56-58. Por lo cual, no hubo, ni en los testimonios ni la evidencia documental, prueba suficiente para implicar a Barahona *1131 Gaetán y Rivera Gómez como los agresores.
Respecto a la agresión contra el joven Luis A. Romero Torres, éste identificó a Ojeda Carrión como la persona que lo agredió en varias ocasiones con su rotén. T.E. de 11 de diciembre de 2003, págs. 41-47. Información que fue confirmada por la señora Torres Pérez.
Como puede apreciarse, la prueba desfilada atiende todos los elementos exigidos para configurar los delitos por los cuales Rodríguez Benabe y Ojeda Carrión fueron acusados. Rodríguez Benabe y Ojeda Carrión fueron identificados como oficiales del orden público que actuaron so color de autoridad y utilizaron sus rótenes durante las agresiones. Además, la versión de los hechos creída por instancia no demuestra que Rodríguez Benabe y Ojeda Carrión intentaron arrestar a los señores Rivera Martínez y Romero Torres antes de que se cometiera la agresión contra éstos, por lo que la agresión se produjo sin que mediara causa legítima.
C. Credibilidad de los testigos.
Los apelantes también cuestionan la credibilidad de los testigos y plantean que la prueba es contradictoria, por lo que instancia debió haber descartado la prueba testifical presentada por el Ministerio Público.
La Regla 10 (D) de Evidencia establece que la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga. 32 L.P.R.A. Ap. IV, R. 10 (D).
Es al juzgador de los hechos en instancia al que le corresponde adjudicar la credibilidad de los testigos, cuando existen contradicciones en sus testimonios. Chévere Heredia, 139 D.P.R., a la pág. 15; Pagán Ortiz, 130 D.P.R., a la pág. 483; Rodríguez Román, 128 D.P.R., a la pág. 129; Puebio v. Ramos Álvarez, 122 D.P.R. 287, 317 (1988); Pueblo v. Rivera Robles, 121 D.P.R. 858, 865 (1988); Pueblo v. Mattei Torres, 121 D.P.R. 600, 609 (1988). Éste; de ordinario, está en mejor posición para aquilatar la prueba testifical, ya que fue el que oyó y vio declarar a los testigos. Cabán Torres, 117 D.P.R., a las págs. 653-654.
En Ortiz v. Cruz Pabón, 103 D.P.R. 939, 947 (1975), el Tribunal Supremo de Puerto Rico expresó:

“...y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical, y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil parata investigación de la verdad: la observación....”.

Sobre el efecto de las contradicciones en la credibilidad de un testimonio, nuestro mas alto foro ha señalado que “debemos recordar que no existe el testimonio perfecto, el cual, de ordinario, en lugar de ser indicativo de-veracidad, es altamente sospechoso por cuanto, por lo general, es producto de la fabricación.” Cabán Torres, 117 D.P.R., a la pág. 656.
De otra parte, nuestro esquema jurídico ha señalado que no se debe revocar una convicción a base de un planteamiento de insuficiencia de prueba que se refiera a credibilidad de testigos en ausencia de prejuicio, parcialidad o error manifiesto. Pueblo v. Acabá Raíces, 118 D.P.R. 369, 375 (1987). De lo contrario, ‘‘la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia, significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción. ” Cabán Torres, 117 D.P.R., a la pag. 648.
Los testigos presentados por el Ministerio Público declararon, específicamente, sobre la intervención de *1132 Rodríguez Benabe y Ojeda Carrión al llegar al Centro Vacacional y la agresión que sufrió Rivera Martínez y otras I personas presentes en la fiesta. Estos testimonios merecieron entera credibilidad al juzgador de los hechos, y I fueron corroborados con los hallazgos de las investigaciones realizadas por las agentes del NIE, Diliana Crespo Talaveras y Vimane Hernández Morales. Si bien es cierto que hubo distintas versiones sobre cómo comenzó el incidente entre los agentes y los señores Vázquez Ortiz y Rivera Martínez, lo cierto es que los testimonios confirman los hechos medulares.
Luego de un detenido análisis de la extensa prueba testifical presentada ante instancia, concluimos que la prueba presentada en el juicio y creída por el juzgador fue suficiente en derecho para sostener las convicciones de Rodríguez Benabe y Ojeda Carrión. Este Tribunal no tiene elementos de juicio para sustituir dicha evaluación Por tal razón, en ausencia de error manifiesto, prejuicio o parcialidad en la apreciación de la prueba, no debemos intervenir con la sentencia emitida por el TPI.
D. Exclusión indebida de evidencia.
Por otra parte, los apelantes alegan que erró el TPI al excluir el testimonio de Rodríguez Benabe y catalogar la prueba presentada como prueba de referencia. Veamos las reglas evidenciarías aplicables.
La prueba de referencia es “[u]na declaración aparte de la que.hace vista, que se ofrece en evidencia para probar la verdad de lo aseverado 32 L.P.R.A. Ap. IV, R. 60. ® A •2 'o o c •5, ■§ *55 m s <o b w 8 45 te w) >> e S -2 o & O CTQ^ p? Os o a* o -
La Regla 61, por su parte, dispone que “salvo que por ley se disponga otra cosa, no será admisible prueba de referencia sino de conformidad con lo dispuesto en este capítulo ” 32 L.P.R.A. Ap. IV, R. 61. Esta norma general I de exclusión de la prueba de referencia está fundada en razones de falta de confiabilidad. Su inadmisibilidad está atada a los riesgos inherentes que presenta relativos a la narración, percepción, recuerdo del acontecimiento y sinceridad del declarante, por. lo que se impone la obligación de considerar esta evidencia con cautela Pueblo, v. García Reyes, 113 D.P.R. 843, 853 (1983).
El profesor Ernesto Chiesa señala que la razón que motiva la regla general de exclusión de prueba de referencia es la falta de confiabilidad de la misma y su dudoso valor probatorio, puesto que, de ordinario - una declaración que-constituye prueba de referencia no tiene las garantías de confiabilidad que se produce mediante un testimonio en corte.^ Un testimonio en corte se hace bajo juramento, frente a la parte perjudicada por la declaración, frente al juzgador que ha de aquilatar su valor probatorio y está sujeta al contrainterrogatorfo de las partes que tengan a bien hacerlo. E.L. Chiesa, Tratado de Derecho Probatorio (Reglas de Evidencia de Puerto Rico y Federales), República Dominicana, Publicaciones J.T.S., Tomo II, a las págs. 616 y 617. Señala además Chiesa, a la pág. 618, que:

La presencia de algunos de estos factores o elementos de confiabilidad será tomada en cuenta en relación con si la declaración debe estar incluida en las reglas de excepción a la regla general de exclusión de prueba de referencia. La admisión de prueba de referencia está fundada, en gran medida, en elementos de confiabilidad, bien sea por razón de la naturaleza misma de la declaración o por la oportunidad de confrontación. Además, hay que contar con el elemento de necesidad, esto es, la no disponibilidad del declarante para testificar en la vista en que la declaración se ofrece como evidencia. ”

Sin embargo, dicha regla de exclusión no es absoluta. La ley contiene unas excepciones que se han establecido a base de razones circunstanciales que abonan a la confiabilidad o probabilidad de veracidad, así como por razones de necesidad. Las excepciones a la regla de exclusión de prueba de referencia están contenidas en las Reglas 62 a 66 de Evidencia.
*1133 La Regla 65 en sus incisos (A) y (B) dispone que:

“Es admisible como excepción a la regla de prueba de referencia aunque el declarante esté disponible como testigo:

A. Declaraciones contemporáneas a la percepción: Una declaración narrando, describiendo o explicando un acto, condición o evento percibido por el declarante y hecha mientras el declarante percibía dicho acto, condición o evento, o inmediatamente después.

B. Declaraciones espontáneas por excitación: Una declaración hecha mientras el declarante estaba bajo la influencia de excitación causada por la percepción de un acto, evento o condición y la declaración se refiere a dicho acto, evento o condición. ” 32 L.P.R.A. Ap. IV, R. 65 (A), (B).
Sobre la excepción contenida en el inciso (A), el profesor Ernesto Chiesa ha destacado lo siguiente:

“La inmediatez de la declaración es el elemento medular de esta regla. No hay tiempo significativo entre la percepción y la declaración, lo que se reduce a un mínimo la probabilidad de fabricación; lo mismo ocurre en cuanto a la probabilidad de olvido o falta de memoria. En esto consiste la confiabilidad de la declaración que justifica la excepción a la regla de exclusión de prueba de referencia. ”

Distinto al caso de declaraciones espontáneas por excitación, no se requiere que se trate de un evento excitante... La Regla tiene tres requisitos para su aplicación, a saber:

“A. contemporaneidad entre el evento y la declaración;

B. percepción del evento por el declarante; y

C. la declaración describe o explica el evento percibido. ”
Véase, Chiesa, supra, a las págs. 762 y 763.
De otra parte, en Pueblo v. Cortés del Castillo, 86 D.P.R. 220, 229 (1962), citado con aprobación en Pueblo v. García Reyes, 113 D.P.R. 843, 849-850 (1983), se establecieron los requisitos para la aplicación de la excepción de las declaraciones espontáneas, anteriormente consideradas una instancia de la excepción de res gestae, a saber: (1) un evento suficientemente alarmante que produzca una manifestación espontánea e irreflexiva; (2) falta de tiempo para inventar la manifestación; y (3) la manifestación debe referirse al evento que la causa. Nieves López v. Rexach Bonet, 124 D.P.R. 427, 435 (1989). El profesor Chiesa señala la existencia de un cuarto elemento: el intervalo de tiempo transcurrido entre lo percibido y lo declarado debe ser tal que no le permita al declarante reflexionar sobre lo que ha percibido. Chiesa, supra, a la pág. 769.
La garantía circunstancial de veracidad de esta excepción yace en la ocurrencia de un evento o suceso de tal naturaleza o intensidad que genere una expresión espontánea. De ordinario, la combinación física y psicológica de estos factores paraliza temporalmente la facultad de reflexión, y ello reduce las probabilidades de fabricación de la declaración. Cortés del Castillo, 86 D.P.R., a la pág. 229. Nuestro Tribunal Supremo dispuso, además, en el caso de Nieves López, 124 D.P.R., a la pág. 435, lo siguiente:
“Para determinar la admisibilidad de este tipo de manifestaciones es menester escudriñar los hechos y circunstancias particulares de cada caso para detectar si el evento puede verdaderamente calificarse como alarmante o excitante (excited utterances). Esto presupone la presentación de prueba independiente para demostrar la espontaneidad de la manifestación.” (Citas omitidas.)
*1134 Conforme a las normas previamente expuestas, una controversia al amparo de la Regla 65 (B) de Evidencia requiere precisar el momento y contenido de la declaración, el estado anímico del declarante y el contexto que rodea la declaración.
Entendemos que la evidencia que tuvo ante sí instancia era contraria a lo alegado por la representación de los apelantes. La transcripción de la prueba ante nos refleja que instancia, luego de evaluar extensamente los argumentos de las partes, concluyó que no existió nada en el testimonió de la señora Feliú Miranda, ni en su “demeanor” que apuntara sobre su estado emocional cuando llegó Rodríguez Benabe. T.E. de 5 de marzo de 2004, págs. 20-22. El TPI expresó, además, desconocer porqué la Defensa no le preguntó a la señora Feliú Miranda qué fue lo que le dijo a Rodríguez Benabe cuando éste llegó a la cocina. T.E. de 5 de marzo de 2004, pág. 36. También, notamos que la señora Feliú Miranda nunca mencionó en su testimonio haber hablado con Rodríguez Benabe. T.E. de 26 de febrero de 2004, págs. 82-83. T.E. de 26 de febrero de 2004, págs. 98-100. Ésta declaró que cuando los agentes entraron al salón, una persona la llevó a la cocina para que se tranquilizara y permaneció ahí hasta que terminó el incidente. T.E. de 26 de febrero de 2004, págs. 98-100. Su testimonio sugiere que la declaración cuya admisibilidad está en controversia no se produjo el día de los hechos como sostiene la Defensa.
Concluimos, pues, que las manifestaciones de la señora Feliú Miranda no proveen las garantías de confiabilidad necesarias para que sean admitidas en evidencia por voz de Rodríguez Benabe. Por ello, resolvemos que no se satisfácen los requisitos establecidos en la Regla 65 (A) y (B) de Evidencia, supra.
En mérito de lo expuesto, revocamos las sentencias impuestas por el Tribunal de Primera Instancia, Sala de Carolina, a Luis Rivera Gómez el 23 de marzo de 2004 y a Warner Barahona Gaetán, el 16 de julio de 2004. Por otro lado, confirmamos las dictadas a Miguel Rodríguez Benabe y Emmanuel Ojeda Carrión, el 16 de julio y 3 de septiembre de 2004, respectivamente, por el referido foro.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 56
1. Éstos resultaron absueltos posteriormente.
2. Por estos hechos, se denunció a Carmen Waleska Rivera Rodríguez por infracciones al Artículo 94 (2 cargos) y al Artículo 260(A) (1 cargo) del Código Penal de 1974, Criminales Números CR2001-0882, CR2001-0942 y CR2001-0943. Luego de los procedimientos, resultó absuelta en el caso criminal CR2001-0882 y culpable en cuanto a los casos criminales CR2001-0942 y CR2001-0943.
3. Contra Rivera Martínez se presentaron varias denuncias bajo los casos criminales VP2002-2993 al 3001, imputándole infracciones al Artículo 401 (3 cargos) de la Ley de Sustancias Controladas, cuatro cargos por Artículo 95(h) agresión agravada con oficiales del orden público, un cargo por alteración a la paz, obstrucción a la justicia y amenaza. Todos estos cargos fueron desestimados al amparo de la Regla 64(n)(6) a solicitud del Ministerio Público por no encontrarse preparado, con la objeción de la prueba de cargo que se encontraba presente y la anuencia de la defensa. Posteriormente, mediante Moción Aclaratoria y en Solicitud de Archivo Regla 247(A), el Ministerio Público y la defensa del imputado solicitaron la enmienda de la resolución para consignar que el archivo era al palio de- la Regla 247 (A) de Procedimiento Criminal.